George W. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant-Cross Appellee,

v.

MACK FARLAND & SONS ROOFING CO., Inc., et al., Defendants-Appellees-Cross Appellants.

No. 26884.

United States Court of Appeals
Fifth Circuit.

July 9, 1969.

Charles Donahue, Sol. of Labor, Harold C. Nystrom, Acting Sol. of Labor, Bessie Margolin, Associate Sol., Robert E. Nagle, James H. Woodson, Edwin G. Salyers, Donald S. Shire, Attys., Dept. of Labor, Washington, D. C., Beverly R. Worrell, Reg. Atty., Dept. of Labor, Atlanta, Ga., for plaintiff-appellant-cross appellee.

John L. Britton, Feibleman, Friedman, Hyman & Britton, Miami, Fla., for defendants-appellees-cross appellants.

Before WISDOM and CARSWELL, Circuit Judges and ROBERTS, District Judge.

WISDOM, Circuit Judge:

The question for decision is whether the two related defendant corporations constitute an "enterprise" within the meaning of the Fair Labor Standards Act.[1] We hold that they do and reverse the judgment below.

The Secretary of Labor brought this action under Section 17 of the Act[2] to enjoin (1) Mack Farland & Sons Roofing Co., Inc., (2) Mack Farland Roofing Co., Inc., and (3) William A. McFarland from violating the overtime and record-keeping requirements of the Act. The Secretary also sought to restrain the defendant from continuing to withhold unpaid compensation due under the Act to their employees covering the period June 13, 1964, to January 29, 1968. It was admitted that defendants' employees

---

1. Act of June 25, 1938, c. 676, 52 Stat. 1060, as amended, 29 U.S.C. § 201 et seq.

2. Section 17, which gives the district courts jurisdiction to restrain violations of the Act in enforcement proceedings initiated by the Secretary, was amended in 1961 to specifically authorize "the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this Act * * *." Prior to that amendment, Section 17 contained an express provision, enacted in 1949, prohibiting such recovery in actions brought under that section, so that payment of back wages was dependent upon the initiative of individual employees—either through the filing of their own actions at law (under Section 16(b)), or through suits by the Secretary upon the "written request" of such employees (under Section 16(c)).

were not paid in accordance with the Act's overtime provisions, defendants having falsified their records to make it appear that employees had been properly paid, either by failing to record all hours worked or by showing payment for recorded hours on the basis of fictitious hourly rates. Moreover, the parties stipulated that employees of defendant Mack Farland & Sons Roofing Co., Inc., were covered by the Act. The district court entered judgment enjoining future violations and granting part of the monetary relief prayed for as to such employees. The defendants contended, however, that employees of the other corporate defendant, Mack Farland Roofing Co., Inc., were not covered. The district court concluded that the Act did not apply to these employees until February 1, 1967, at which time the 1966 Amendments to the Act became effective. Accordingly, although the district court entered judgment enjoining compensation found to be due the employees of this defendant, such overtime compensation was limited to amounts which had accrued subsequent to February 1, 1967.

## I.

The "enterprise coverage" provisions added to the Act by the Amendments of 1961 (75 Stat. 65) provide minimum wage and overtime protection to any employee who is "employed by an enterprise engaged in commerce or in the production of goods for commerce". Section 3 of the Act defines "enterprise" as follows:

"Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units, including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent con-

tractor * * *. 29 U.S.C. § 203 (r).

Under Section 7(a) (1) of the Act covered employers were required to pay their employees the statutory overtime premium for all weekly hours in excess of 44 during the period prior to September 3, 1964, for all weekly hours in excess of 42 prior to September 3, 1965, and for all weekly hours in excess of 40 thereafter.

The Amendments of 1961 did not apply to enterprises "engaged in the business of construction, or reconstruction, or both", if the annual gross volume from the business was less than $350,-000.

The Fair Labor Standards Amendments of 1966 (80 Stat. 830), which became effective February 1, 1967, eliminated the dollar volume test for coverage of enterprises engaged in the business of construction or reconstruction. Employers who became subject to the Act solely because of such Amendments were required to pay the statutory overtime premium only after 44 hours a week during the period February 1, 1967, to January 31, 1968 (Section 7(a) (2)).

The parties stipulated in this case that during each year in question the "annual gross volume" from the business of Mack Farland & Sons Roofing Co., Inc. exceeded the $350,000 specified in Section 3(s) (4), but that the "annual gross volume" of Mack Farland Roofing Co., Inc., was at all times less than $350,000. Thus it was undisputed that at all times pertinent here Mack Farland & Sons Roofing Co., Inc., was a covered enterprise required to pay overtime compensation after 40 hours a week, but that Mack Farland Co., Inc., if considered alone, became a covered enterprise only when the dollar volume test was eliminated on February 1, 1967, and was required to pay overtime compensation only after 44 hours a week from that date until January 31, 1968. However, it was the Secretary's contention that the two corporations at all times comprised a single enterprise within the meaning of Section 3(r), entitling the

employees of both corporations to overtime compensation after 40 hours per week throughout the period covered by this action.

■ The case turns on whether the defendant corporations engaged in "related activities" through "unified operations" or "common control" for a "common business purpose".

## II.

We turn now to the record. It shows that William A. McFarland dominated both corporations, exercised control over their operations, and in practical effect used the two corporations as a single enterprise to engage in the roofing business.

McFarland, who has been in the roofing business since 1952, founded both corporations and is a major stockholder, president, and director of both corporations. During the period covered by this action (June 13, 1964, to January 29, 1968), the companies were in the roofing business in Broward County, Florida.

In 1959, Mr. McFarland organized Mack Farland & Sons Roofing Co., Inc., which has its principal office in Hollywood, Florida. He provided all of the necessary capital. Although 100 shares of stock are authorized, only 18 shares were issued, held as follows: Mr. McFarland eight shares (44%), his son, Larry McFarland, also eight shares, Mary Lee Straub Piltz (Mr. McFarland's secretary and bookkeeper for both corporate defendants) one share, and Adolphus Smith one share. Only Mr. McFarland had any financial investment in the corporation. The officers and directors of the Hollywood corporation are Mr. McFarland, his brother, Charles McFarland, and Mrs. Piltz.

The Hollywood corporation performed most of its work in the southern part of Broward County, but it also performed some work in the vicinity of Pompano, some fifteen or twenty miles to the north, necessitating the establishment of a place of business in Pompano. The employees at that location, however, continued to be carried on a single payroll with the employees at Hollywood.

In 1963, McFarland incorporated the Pompano business under the name of Mack Farland Roofing Co., Inc. Again, he provided all of the capital and, as he testified, he set the management policy of this corporation, as he did the original corporation, and was considered the "boss" by the employees. The new corporation took over the jobs that the Hollywood establishment had in that area, but most of its business was developed on its own. According to the testimony of Mr. McFarland, the Pompano corporation took care of the work in the norther portion of defendants' sales territory, while the work in the southern end was handled by the Hollywood corporation. This division, he stated, was "more or less" a matter of "geographical convenience," since it was "a little too far for our foremen to go from Hollywood to Pompano".

Of the 100 shares of stock authorized for the Pompano corporation, only 30 were issued. Although these were equally distributed among Mr. McFarland, his brother, Charles McFarland, and Mrs. Piltz, again Mr. McFarland is the only person with any financial investment in the corporation. Mr. McFarland, Larry McFarland and Mrs. Piltz serve as officers and directors.

The two corporations maintained separate supervisors and crewmen, but on occasions there were interchanges of employees when a crew was shorthanded or far behind in its work. In 1965, or 1966, shortly after the wage and hour investigation giving rise to this action, Charles McFarland quit, and the Pompano establishment was closed. As stated by William McFarland, when "my brother quit me, * * * I pulled the personnel back down to Hollywood and ran it out of there". The Pompano employees now work out of the Hollywood establishment.

Although Mr. McFarland has placed both corporate defendants under the immediate management of various supervi-

sors during the three or four years preceding the trial the record shows that he retained ultimate control over their operations. He testified that he has "a lot to do with the business", that he still maintains his office at the Hollywood establishment, that he goes there on "numerous occasions" and that he has not diminished his ownership interest in the business. And, while the supervisors and crew chiefs (foremen) had the authority to hire and fire employees, and to set their rates of pay, Mr. McFarland testified that he still exercises authority concerning the hiring and firing of supervisory personnel. He testified that his brother's operations in managing the Pompano corporation were subject to his veto, because he himself was still the "top man".

Thus the record shows that Mr. McFarland is the founder, president, and sole investor in both corporations; that he set the management policy for each corporation; that he continues to exercise authority over the hiring and firing of supervisory personnel as well as their hours, work assignments and rates of pay; that after "my brother quit me" at the Pompano establishment, he "pulled the personnel back down to Hollywood and ran it out of there". In short, he was, by his own admission, at all times the "top man".

### III.

The district court apparently based its decision that the Pompano corporation was not part of the enterprise on the physical separation of the two corporations and the separate supervision and bookkeeping maintained for each. We take the view that these factors are simply the ordinary attributes of separate incorporation and the management of physically separate units.

■ We start with the proposition that the Act should be liberally construed.[3] The statute defines "enter-

prise" broadly to include related activities "whether performed in one or more establishments or by one or more corporate or other organizational units" (Section 3(r)). Thus, the very terms of the statute obviously contemplate that a covered "enterprise" may be comprised of separately incorporated establishments whose financial transactions are separately accounted for, as are those of any corporation, or whose business is conducted with that degree of independence in day-to-day operational management which is normally characteristic of physically separated establishments or multiple organizational units. That this was indeed the original intent of Congress was reaffirmed in 1966 when the "enterprise" provisions were amended, for at that time the committee reports of both the House and Senate, in discussing the basic purpose of the original provision, pointed out:

* * * the operations through substantial ownership or control of a number of firms engaged in similar types of business activities constitute, in the committee's view, related activities performed through unified operation or common control within the meaning of the definition of enterprise. The fact that the firms are independently incorporated or physically separate or under the immediate discretion of local management, as in Wirtz v. Hardin * * * is not determinative of this question. [House Report No. 1366, 89th Cong., 2nd Sess., p. 9; Senate Report No. 1487, 89th Cong., 2nd Sess., p. 7 (reproduced in 1966 U.S.Code Cong. News, pp. 3002, 3009)].

Wirtz v. Hardin, & Co., N.D. Ala. 1964, 253 F.Supp. 579, affirmed in a brief per curiam, 359 F.2d 792, referred to and repudiated in the committee reports, is the only case we have found that even remotely supports the defendants' position. In that case the court

---

3. Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Mitchell v. Lublin, McGaughy & Ass'n, 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed. 2d 243; Mitchell v. Empire Gas Engineering Co., 5 Cir. 1958, 256 F.2d 781, 784.

held that six retail grocery stores did not constitute an enterprise under the Act. In that case, however, there was no common control because the managers of the six stores had substantial investments in the stores they operated. Here, McFarland put up all the capital for both corporations. Money talks. It talked through McFarland who ran the corporations as his venture into the roofing business in Broward County.

In Wirtz v. Barnes Grocer Company, 8 Cir. 1968, 398 F.2d 718, the component businesses operated with a greater degree of independence than the two defendant corporations did here. In *Barnes* one corporation engaged in a wholesale grocery business, another operated two retail grocery stores, a third operated its retail grocery store. Each of the stores was supervised by a manager having authority comparable to that exercised here by the supervisors. In holding that the three corporations comprised a single enterprise, the court looked to "whether there is substantial ownership or control of the firms, whether separately incorporated or not". Among the factors leading to this conclusion was the fact that the managers were selected by, and were under the general supervision of an individual representing the controlling stock interest —just as the supervisors in the instant case were selected by, and were under the general supervision of Mr. McFarland. The court distinguished *Hardin*.

■ "Common control" may exist, as it did here, despite the separate management of the individual establishments. In West v. Wal-Mart, Inc., W.D. Ark. 1967, 264 F.Supp. 158, there were three separately incorporated discount stores and a management partnership. The court held that these companies comprised a single enterprise. The court ruled that the existence of a dominant shareholder with power to hire, fire, and direct the individual store managers established "common control" within the meaning of Section 3(r), despite the fact that "[t]he stores were run on somewhat of an individual basis with each manager having extensive authority with respect to control over his own operation," including advertising, merchandising, and personnel matters. *Barnes* expressly approved *Wal-Mart*.

A similar approach has been taken under other statutes which involve a similar "control" test. Under the Renegotiation Act, for example, the question of whether two or more corporations are "under common control" may be determinative of whether certain contracts are subject to that Act. See 50 U.S.C. App. § 1191(c) (6) (B). Applying the principle approved in Lowell Wool By-Prod. Co. v. War Contracts P. Adj. Bd., 89 U.S.App.D.C. 281, 192 F.2d 405, that "power of actual control rather than exercise of that power is the only necessary requirement", the Tax Court has repeatedly found the existence of "common control" regardless of the extent to which those in "control" might leave to others the normal operation of the separate business establishments. See, e.g., Hoffman v. United States, 23 T.C. 569; Pechtel v. United States, 18 T.C. 851; Finnie Co. v. United States, 31 T.C. 1182. Similarly, the Ninth Circuit, in Sakrete of Northern California, Inc. v. NLRB, 332 F.2d 902, cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556, has rejected the contention that "centralized control and common management at the local level" must be shown in order to satisfy the comparable criteria for treating two corporations as a single enterprise under the National Labor Relations Act. Pointing to the impracticability of two separately located companies being managed at the local level by one man or management group, the court concluded that "[i]f there is overall control of critical matters at the policy level, the fact that there are variances in local management decisions will not defeat application of the 'single employer' principle".

We conclude that the district court erred in failing to hold that the two corporations constituted an "enterprise"

within the meaning of the Fair Labor Standards Act.

## IV.

The Secretary also appeals from the district court's refusal of leave to amend the complaint so as to include in the back pay award those employees who joined the defendant companies after the action had been filed. The Secretary points out that the pre-trial order made specific provision for such amendment. We note that the case was transferred to a new judge after the pre-trial order had been approved. We agree that it was error for the second judge to deny leave to amend in light of the previous order and in light of the absence of any prejudice to the defendants that might result from the amendment. Fed.R.Civ.P. 15 and 16; Weil Clothing Co. v. Glasser, 5 Cir. 1954, 213 F.2d 296, 299.

## V.

The district court had reservations about ordering the payment of back wages. The reservations were not based on the defendants' good faith: the defendants deliberately falsified their records to make it appear that their employees had been properly paid. The court was concerned because a back pay order "would work a great hardship" upon the defendant.

As this Court has pointed out in describing the purpose of this remedy, the retention of sums withheld in violation of the Act represents "a continuing offense against the public interest," which can be corrected only through "enforced payment, which must be made" as "part of a reasonable and effective means which Congress, after trial and error,

found it necessary to adopt to bring about general compliance * * *." Wirtz v. Jones, 5 Cir. 1965, 340 F.2d 901, 904. In Wirtz v. Malthor, 9 Cir. 1968, 391 F.2d 1, the Court said:

It must be remembered that restraining appellees from withholding the minimum wages and overtime compensation is meant to vindicate a public, rather than a private right, and that the withholding of the money due is considered a "continuing public offense." * * * The 1961 amendment of Section 17 (29 U.S.C. § 217) authorizing the restraint that the Secretary requests here had at least two purposes. First, the restraint was meant to increase the effectiveness of the enforcement of the Act by depriving a violator of any gains accruing to him through his violation. Second, the amendment was meant to protect those employers who comply with the Act from having to compete unfavorably with employers who do not comply. (Senate Report No. 145, 87th Cong., 1st Sess., 1961, 1961 U.S. Code Cong. and Admin. News 1620 at 1658–1659). Those public purposes can be fulfilled in this case only by restraining the appellees from further withholding the unpaid compensation.

We hold, therefore, that the court below correctly enjoined the defendants, including William A. McFarland, from future violations of the Act and from the continued withholding of unpaid overtime compensation found to be due to their employees.

The judgment of the district court is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.