[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 29, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15931

_____

D. C. Docket No. 05-00269-CV-ORL-28-JGG

ISRAEL ALVAREZ PEREZ,

Plaintiff-Appellee
Cross-Appellant,

versus

SANFORD-ORLANDO KENNEL CLUB, INC.,
COLLINS & COLLINS,
d.b.a. CCC Racing,

Defendants-Appellants
Cross-Appellees,

JACK COLLINS,

Defendant
Cross-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(January 29, 2008)**

Before CARNES, BARKETT and HILL, Circuit Judges.

CARNES, Circuit Judge:

This appeal and cross-appeal arise from an overtime wages lawsuit brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201–19, by Israel Alvarez Perez against Sanford-Orlando Kennel Club, Inc., Collins & Collins Partnership d/b/a CCC Racing, and Jack Collins, Sr. The judgment winding up the litigation in the district court found Kennel Club and CCC Racing, but not Collins, Sr., liable for a violation of the FLSA overtime wages provision and awarded damages, but not liquidated damages, to Perez. All of the parties except Collins, Sr. were unhappy with one or more parts of the judgment.

Kennel Club and CCC Racing have appealed from the judgment insofar as it found them liable on the overtime claim. They contend that the district court should have granted them judgment as a matter of law on the theory that they are separate establishments, which would mean that each of them was a seasonal operation qualifying for the recreational and amusement exemption in 29 U.S.C. § 213(a)(3).

Perez has cross-appealed from two aspects of the judgment. He contends that the district court erred in granting Collins, Sr. judgment as a matter of law on the theory that he was not Perez's employer. He also contends that in light of the

2

jury's finding for statute of limitations purposes that the violations were willful, it was error for the court to then find that the defendants had acted in good faith, thereby precluding liquidated damages.

## I.

From 1955 through 2001, Kennel Club operated a winter greyhound racing season from November through May of each year at its Longwood facility near Orlando, Florida. At that time, there was another facility—the Seminole Raceway—located just two or three miles away from Kennel Club that operated a summer season of greyhound racing. In November 2000 Jack Collins, Jr., on behalf of Kennel Club, initiated discussions with Seminole Raceway's management, inquiring whether Seminole would sell its summer racing permit to Kennel Club. Seminole wanted to get out of the greyhound racing business, but some Kennel Club shareholders refused to help Collins, Sr. put up the necessary capital to finance the purchase agreement.

As a result, Collins & Collins Partnership purchased Seminole's summer racing permit with the personal funds of Jack Collins, Sr., who was an officer and majority shareholder of both Kennel Club and Collins & Collins Partnership. The purchase added a summer race season at Kennel Club's facility to the winter one already being conducted there. Around the same time, Kennel Club registered with

3

the Department of State the name Collins & Collins Partnership d/b/a CCC Racing.

In May 2001 CCC Racing entered into an agreement with Kennel Club to use its facility during the summer months. In that agreement Kennel Club authorized CCC Racing to operate a summer season of greyhound racing at the Longwood facility from May through October of each year. During that summer season, CCC Racing would be responsible for the operations of the Longwood facility: the "general operational activities," "marketing activities," and all "administrative activities, including accounting, legal, and compliance activities." As consideration, the agreement entitled Kennel Club "to receive One and One-Half (1.5%) of the aggregate 'pari-mutuel wagering handle'" earned by CCC Racing during each summer season. That percentage amounted to $398,821 in 2002 and $388,044 in 2003.

Kennel Club continued conducting winter race meets at the Longwood facility, while CCC Racing began conducting summer race meets there. Although Kennel Club and CCC Racing maintained separate bank accounts, payrolls, tax identification numbers, and permits, the companies did share the same facility, telephone number, credit card, and general liability insurance policy. Money coming from Kennel Club's operating accounts was also recorded as a payable on CCC Racing's books, and CCC Racing controlled Kennel Club's operating cash.

4

As for the management of the Longwood facility, an agreement between Kennel Club and CCC Racing named Jack Collins, Sr. as the managing agent of the facility. Despite his official position and being known as "the head boss," Collins, Sr.'s sons had actually run the business for him since he suffered a heart attack in 1998. Jack Collins, Jr., rather than his father, had ultimate authority over hiring and firing decisions. In fact, Collins, Sr. had visited the facility only once a year since his heart attack. He had not taken part in the day-to-day operations of the facility since 1998, nor had he been involved in the hiring and firing of employees, employee assignments, determining employee compensation, or supervising employees.

Once the Longwood facility began operating year-round, many employees who worked for Kennel Club during the winter race seasons continued to work for CCC Racing during the new summer seasons. In fact, a majority of the employees at Kennel Club and CCC Racing worked for both companies. These employees performed the same work year-round, with the only notable difference being that they received separate paychecks from the two entities for each half of the year. Perez, who worked maintenance at the racetrack facility for nearly two years, was one of these employees. He generally received separate tax forms and paychecks from Kennel Club and CCC Racing. On one occasion, however, Perez was paid by

Kennel Club during a period in which CCC Racing was operating the Longwood facility.

In February 2005 Perez filed a complaint in the Middle District of Florida against both Kennel Club and Jack Collins, Sr., which Perez later amended to include CCC Racing as an additional defendant. The complaint contended that all of the defendants were Perez's former employers and had "repeatedly and willfully" violated 29 U.S.C. § 207 "by failing to compensate [him] at a rate not less than one and one-half times his regular rate at which he was employed for workweeks longer than (40) hours." He asked that the defendants be held jointly and severally liable for unpaid overtime wages and for an additional amount as liquidated damages.

The defendants answered Perez's complaint by asserting that they were not his employers under the FLSA, and that his claims were barred by the recreational and amusement exemption in 29 U.S.C. § 213(a)(3) under what they characterized as the "six-month receipts test and/or the seasonal operation test." They also asserted that the claims were "barred, in whole or in part, by the applicable statute of limitations," and that "[a]ll actions taken by the Defendants with respect to its [sic] relationship with [Perez] were in good faith and based on legitimate business interests."

6

The district court conducted a two-day jury trial in September 2006. After the conclusion of Perez's case, the defendants moved for judgment as a matter of law.[1] The district court reserved judgment on that motion and ultimately sent the case to the jury, which returned a verdict in favor of Perez against all three defendants. Specifically, the jury found that each of the defendants was not "exempt from the [FLSA] through the seasonal operation exemption or the six-month receipts test," that Collins, Sr. was Perez's employer, and that each of the defendants had failed to pay Perez the overtime compensation to which he was entitled by law. On the statute of limitations issue, the jury found that the defendants "either knew or showed reckless disregard for whether its conduct was prohibited by the FLSA," meaning that they acted willfully.

Following the jury's verdict, the defendants renewed their motions for judgment as a matter of law and also moved for a new trial. The district court granted judgment as a matter of law to Collins, Sr. concluding that he was not Perez's employer under the FLSA because, although he "may have owned the company and he may have had control as the owner," he did not have the dealings

---

[1] Actually, what happened at the end of the Perez's case is that the district court did not permit the defendants to orally make or discuss any motion: "Counsel, you can reserve. Reserve your motions. All right. Call your first witness." After the defense rested, the defendants again moved for judgment as a matter of law, filing a written motion in open court. The district court reserved ruling on the motion to give Perez an opportunity to brief the issue. The following morning, the district court denied the motion. The defendants did what they could to preserve the issues raised in their motion, and Perez does not contend to the contrary.

7

with employees that the FLSA requires. As to Kennel Club and CCC Racing, the district court denied their motions.

Although the district court allowed the jury's verdict against Kennel Club and CCC Racing to stand, it denied Perez's motion for liquidated damages. As a basis for that denial, the court relied on its own finding that Kennel Club and CCC Racing had sought advice regarding the exemption issue from both an attorney and their payroll company. The court was satisfied that this was enough to show that they had acted in good faith for purposes of 29 U.S.C. § 260, even though the jury, in connection with the statute of limitations issue, had found that their violations of the FLSA had been willful ("either knew or showed reckless disregard for whether its conduct was prohibited by the FLSA"). The court explained that the inconsistency between its finding and the jury's was permitted because it was "within the Court's domain, not the jury's, to determine whether Defendants established a good faith defense," thereby precluding liquidated damages.

Kennel Club and CCC Racing filed this appeal. They contend that the district court erred in denying their motions for judgment as a matter of law because they are exempt from the overtime requirement of the FLSA pursuant to the recreational and amusement exemption in 29 U.S.C. § 213(a)(3). They also contend that there is insufficient evidence in the record to support the jury's verdict

8

against them in light of their evidence on the exemption issue. Perez has filed a cross-appeal, contending that the district court erred both in granting Collins, Sr.'s renewed motion for judgment as a matter of law and in denying Perez an award of liquidated damages.

## II.

Congress enacted the FLSA "in order to eliminate 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996) (quoting 29 U.S.C. §§ 202(a) & (b)). To those ends, 29 U.S.C. § 207 requires that employers pay time and a half for those hours that an employee works in excess of the standard forty hour work week. 29 U.S.C. § 207(a)(1). Section 213, however, lists a host of exemptions to the FLSA's minimum wage and maximum hour requirements. See id. § 213. The exemptions "are to be construed narrowly," and the employer shoulders the burden of establishing that it is entitled to an exemption. Evans v. McClain of Ga., Inc., 131 F.3d 957, 965 (11th Cir. 1997).

The recreational and amusement exemption at issue in this case provides:

The provisions of . . . section 207 of this title shall not apply with respect to . . . any employee employed by an establishment which is an amusement or recreational establishment . . . if (A) it does not operate for more than seven months in any calendar year, or (B) during the

9

preceding calendar year, its average receipts for any six months of such year were not more than 33 1/3 per centum of its average receipts for the other six months of such year . . . .

29 U.S.C. §§ 213(a), (a)(3). Under that controlling provision, therefore, an employer qualifies for exemption if it is a recreational and amusement establishment and it also satisfies either the seasonal operation test or the six-month receipts test. See id.

No one questions that Kennel Club and CCC Racing are in the recreation or amusement business. And no one disputes that if they are considered as separate establishments, each of them qualifies for the § 213(a)(3) exemption because each one operates for less than seven months a year and also satisfies the six-month receipts test. Likewise, no one disputes that if Kennel Club and CCC Racing are grouped together and considered as one establishment, the combined entity is not entitled to the benefit of the § 213(a)(3) exemption, because cumulatively it operates year-round and fails to satisfy the six-month receipts test. The disagreement is about whether Kennel Club and CCC Racing should be considered as one establishment or two for § 213(a)(3) purposes. The answer depends on what constitutes the "establishment" under that provision, which "is a problem of

10

law to be decided from all the facts in [the] case," Acme Car & Truck Rentals, Inc. v. Hooper, 331 F.2d 442, 444 (5th Cir. 1964).[2]

Kennel Club and CCC Racing contend that Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590 (11th Cir. 1995) (per curiam), supports their position that they are exempt under § 213(a)(3). It does not. In that case we concluded that a minor league baseball team, which leased a facility to use during the months of spring training, was exempt as a recreational and amusement establishment under § 213(a)(3). Id. at 594–95. That case involved an issue about the seasonal operation test and how to apply it in a situation where the defendant was one separate business. Id. at 594 (stating the issue as "whether or not Defendant's business is truly seasonal"). The Jeffery case did not present the pivotal issue before us, which arises from the fact that Kennel Club and CCC Racing share a single facility and are commonly owned and controlled. Because there was no similar two versus one establishment question in Jeffery, that decision is not helpful. The text of the FLSA itself is not helpful either. Although the term "establishment" is used in several different provisions, nowhere in the Act is it defined.

The Supreme Court's decision in A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 65 S. Ct. 807 (1945), interpreted an earlier version of the retail and service

---

[2] See Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in the Eleventh Circuit all decisions of the former Fifth Circuit announced prior to October 1, 1981).

11

establishment exemption, which was then contained in 29 U.S.C. § 213(a)(2). In doing so, the Court defined an "establishment" as "a distinct physical place of business," because that is the way the term is ordinarily used in business and government. Id. at 496, 65 S. Ct. at 810 (concluding that a chain of grocery stores and its central warehouse were not a single retail establishment under the retail and service establishment exemption and, therefore, were bound by the provisions of the FLSA). The Phillips definition is reflected in the Code of Federal Regulations, which states that generally in the Act "the term establishment . . . refers to a 'distinct physical place of business' rather than to 'an entire business or enterprise' which may include several separate places of business." 29 C.F.R. § 779.23; see also id. § 779.203.

In Marshall v. Sundial Associates, Ltd., 588 F.2d 120, 122 (5th Cir. 1979), we applied the Supreme Court's teachings in Phillips when we interpreted the term "establishment" as used in the hotel establishment exemption of 29 U.S.C. § 213(b)(8). Our conclusion was that "when a part of a business complex seeks exemption as a separate establishment it must at least show that it has a physically separate place of business." Id.

As additional support for our interpretation of the term "establishment," we cited in Sundial to 29 C.F.R. § 779.305, which provides in pertinent part:

12

Although . . . two or more departments of a business may constitute a single establishment, two or more physically separated portions of a business though located on the same premises, and even under the same roof in some circumstances may constitute more than one establishment for purposes of exemptions. In order to effect such a result physical separation is a prerequisite. In addition, the physically separated portions of the business also must be engaged in operations which are functionally separated from each other. . . . In other words, [a] portion of an establishment would be considered a separate establishment from the unrelated portion for the purpose of the exemption if: (a) It is physically separated from the other activities; and (b) it is functionally operated as a separate unit having separate records, and separate bookkeeping; and (c) there is no interchange of employees between the units. The requirement that there be no interchange of employees between the units does not mean that an employee of one unit may not occasionally, when circumstances require it, render some help in the other units or that one employee of one unit may not be transferred to work in the other unit. The requirement has reference to the indiscriminate use of the employee in both units without regard to the segregated functions of such units.

29 C.F.R. § 779.305; see Sundial, 588 F.2d at 123. We stated that § 779.305 applies not only to the retail and service establishment exemption, but also to a number of exemptions listed in 29 C.F.R. § 779.302, including the hotel establishment exemption. Sundial, 588 F.2d at 123 n.2 (explaining that § 779.305 is "to be applied to a number of exemptions including § 213(b)(8)").

Because the companies in the Sundial case were "completely physically intertwined," we determined that they were to be treated as a single establishment despite the fact that they maintained separate business identities, books, and payrolls. Id. at 123. We acknowledged that those factors may be relevant in

13

deciding the scope of an establishment in certain circumstances, but explained that "they only become significant once the employer has shown that a distinct physical establishment exists."  Id.; see also Montalvo v. Tower Life Bldg., 426 F.2d 1135, 1144–45 (5th Cir. 1970) (stating that "functional unity" is "normally invoked to show that two or more places of business which are physically separated should be considered a single establishment," but is inappropriate where "business activities of a single enterprise take place within a single distinct physical place of business").

The Phillips, Sundial, and Montalvo decisions govern situations where there are two business operations being conducted at the same time, which is what each of those cases involved.  It makes sense that two businesses being conducted at the same time are more likely to be considered one establishment if they are at the same place.  Physical separation is important when there is no separation in time. When, however, business operations are conducted in different seasons, physical separation is of much less importance.  As the First Circuit has explained:

> While "physical location" may be relevant in applying an exemption
> depending on the nature of a particular business (such as whether the
> employer is a retail sales company), it has little to do with an
> exemption based on the periods in which a business operates.  A
> common place of business alone is particularly inapposite to
> application of an exemption based on seasonality, as two seasonal
> businesses may, by operating at different times, utilize the same
> location while retaining their independence.  Such a test in effect begs

14

the question, because the possibility remains that the two businesses, being independently seasonal, are able to retain their separate identities notwithstanding common use of the single facility.

Marshall v. New Hampshire Jockey Club, Inc., 562 F.2d 1323, 1331 n.3 (1st Cir. 1977).

What we take away from our Sundial decision is that while 29 C.F.R. § 779.305 ("Exemptions for Certain Retail or Service Establishments") explicitly applies to the retail and service exemptions, its three-requirement definition of an establishment may be borrowed to define establishment for purposes of other exemptions. See Sundial, 588 F.2d at 123 n.2 (concluding that it is "to be applied to a number of exemptions including § 213(b)(8)"). The First Circuit borrowed it for that purpose in the Marshall case, 562 F.2d at 1329, which involved racetrack facts, as our present case does.

Because 29 C.F.R. § 779.305 lists the three requirements in the conjunctive, Kennel Club and CCC Racing must satisfy each of them in order to qualify as separate establishments entitled to benefit from the § 213(a)(3) recreational and amusement exemption. See also Gilreath v. Daniel Funeral Home, Inc., 421 F.2d 504, 510 (8th Cir. 1970) ("Since the three prerequisites of 29 C.F.R. § 779.305 are joined in the conjunctive, the defendant cannot prevail on its exemption claim without proof of conformity to each requirement.").

15

Whatever we might decide about the first and third § 779.305 requirements, Kennel Club and CCC Racing do not meet the second one, which is that each business be "functionally operated as a separate unit having separate records, and separate bookkeeping." 29 C.F.R. § 779.305. Although their separate bank accounts, payrolls, tax identification numbers, and permits show that Kennel Club and CCC Racing were organized as distinct entities, those facts are not enough to establish that they were operated as separate units. The language of the regulation requires businesses to be "functionally operated as . . . separate unit[s] having separate records, and separate bookkeeping" in order to qualify as distinct establishments. 29 C.F.R. § 779.305. Entities that are set up separately can be operated jointly. Put a little differently, separate books and records may show the existence of more than one corporate entity, but they do not necessarily show more than one establishment for FLSA exemption purposes. See Acme Car & Truck Rentals, 331 F.2d at 445 (determining that two corporations were functionally one entity and thus a single establishment where the only distinction between them was "their separate corporate existences" and "all the implications thereof, i.e., separate records and taxes," but they were commonly owned and controlled, shared the same officers, used the same premises, and hired the same employees).

In its FLSA racetrack case the First Circuit concluded that the two seasonal businesses, under the facts of that case, functionally operated as separate units. See Marshall, 562 F.2d at 1331. The companies in that case maintained separate records, received different tax treatment, and exercised independent decision making with respect to hiring employees. Id. The First Circuit looked beyond those facts, however, to inquire "more broadly" into "the integrity of the economic . . . and functional separation between the business units." Id. (internal quotation marks and citation omitted) (ellipsis in original). One company conducted thoroughbred racing during one part of the year, and the other conducted harness racing during a different part of the year. Id. at 1327. After pointing out that there were important differences between those two types of racing, which resulted in variations in business risks and in the patterns of state regulation for the companies, the court reasoned that the two defendants were economically independent of each other. Id. at 1332. It concluded that they were not a single establishment for purposes of the § 213(a)(3) recreational and amusement exemption. Id.

Although Kennel Club and CCC Racing also maintained separate records and tax identification numbers, unlike the defendants in Marshall, they operated the same sport—greyhound racing—and were similarly regulated by the state.

They also failed to keep their corporate identities distinct and their operations separate to the extent that the Marshall defendants did.

Kennel Club paid the Department of State filing fee to register CCC Racing's fictitious name. The two shared a single credit card. They shared one general liability insurance policy. On at least one occasion when Perez was supposedly working for CCC Racing, he was actually paid by Kennel Club. CCC Racing controlled Kennel Club's operating cash, and money from Kennel Club's operating accounts was recorded as a payable on CCC Racing's books. CCC Racing's summer racing permit was purchased with the personal funds of Jack Collins, Sr., who was the majority shareholder of both Kennel Club and CCC Racing. He was also the designated managing agent at the Longwood facility year-round pursuant to the agreement between the companies. Similarly, Tom Bowersox served as the director of racing and operations at the facility for both companies. Because Kennel Club and CCC Racing intermingled funds and in many aspects of management functioned as a single unit, they were not separate establishments.

For these reasons, the jury reasonably could have found, as it did, that Kennel Club and CCC Racing failed to carry their burden of establishing that they were entitled to the recreational and amusement exemption of 29 U.S.C. §

18

213(a)(3). The district court correctly denied their motions for judgment as a matter of law, which were dependent upon the proposition that they were separate establishments.

## III.

Turning now to Perez's cross-appeal, his first contention is that the district court erred when it granted Collins, Sr.'s renewed motion for judgment as a matter of law on the ground that he was not an employer within the meaning of the FLSA. When deciding whether to uphold a ruling on such a motion, "the standard of review to be applied by this Court is the same as that applied by the district court . . . . If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).

Collins, Sr. cannot be held individually liable for violating the overtime provision of the FLSA unless he is an "employer" within the meaning of the Act. 29 U.S.C. § 207(a)(1); Donovan v. Grim Hotel Co., 747 F.2d 966, 971 (5th Cir. 1984). Section 203 broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Whether an individual falls within this definition "does not depend on technical or 'isolated factors but rather on the circumstances of the whole

19

activity.'" Hodgson v. Griffin & Brand of McAllen, Inc., 471 F.2d 235, 237 (5th Cir. 1973) (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S. Ct. 1473, 1477 (1947)).

Perez argues that Collins, Sr. exercised enough control over Kennel Club and CCC Racing for him to be treated as an employer under the FLSA. We have recognized that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Patel v. Wargo, 803 F.2d 632, 637–38 (11th Cir. 1986) (internal quotation marks and citation omitted). However, we have also made clear that in order to qualify as an employer for this purpose, an officer "must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." Id. at 638.

Our decision in Patel is instructive. There we held that the defendant, who was both the president and vice-president of a corporation, as well as a director and a principal stockholder, was not an employer for FLSA purposes. We reached that conclusion because he did not "have operational control of significant aspects of [the company's] day-to-day functions, including compensation of employees or other matters in relation to an employee." Id. (internal quotation marks omitted);

20

see also Wirtz v. Pure Ice Co., 322 F.2d 259, 263 (8th Cir. 1963) (finding that a majority stockholder who visited the company only two or three times a year and "had nothing to do with the hiring of the employees or fixing their wages or hours" was not an employer under the FLSA). While acknowledging that the defendant in Patel could have, if he had chosen, played a greater role in the operations of the company, we focused on the role that he did play in concluding that he "lacked the operational control necessary for the imposition of liability as an 'employer' under the FLSA." Patel, 803 F.2d at 638; see also Wirtz, 322 F.2d at 262 ("There is little question from the record but what Thompson as the majority stockholder and dominant personality in Pure Ice Company, Inc., could have taken over and supervised the relationship between the corporation and its employees had he decided to do so. A careful reading of the record, however, indicates that he did not do so.").

Like the president in Patel, Collins, Sr. did not take such an active role in the day-to-day operations of Kennel Club and CCC Racing. The undisputed evidence established that his sons—not Collins, Sr. himself—had exercised considerable control at the Longwood facility since 1998, the year he had a heart attack. Jack Collins, Jr. testified that he was the one who had the ultimate say concerning hiring and firing decisions at Kennel Club, and that his father had not even visited the

21

facility more than once a year. Collins, Sr. testified that since 1988 he had not taken part in the day-to-day operations of the facility, had not been involved in the supervision or hiring and firing of employees, and had not determined their compensation. Tom Bowersox—the director of racing and operations—admitted that he would have complied with any directive Collins, Sr. gave him, but testified that Collins, Sr. had never given him any instructions about an employment matter. Although Collins, Sr. remained the designated managing agent under the agreement between Kennel Club and CCC Racing even after his heart attack in 1998, and he could have played a greater role in the day-to-day operations of the Longwood facility if he had desired, Patel instructs that unexercised authority is insufficient to establish liability as an employer. See Patel, 803 F.2d at 638; see also Wirtz, 322 F.2d at 262.

Perez's attorney suggested at oral argument that we should find the Sixth Circuit's decision in Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962 (6th Cir. 1991), helpful on this issue, but we don't find it helpful to his side. In Dole, the Sixth Circuit affirmed the district court's order granting summary judgment against the president and co-owner of a corporation on the FLSA employer issue. Id. at 966. The president in the Dole case, however, not only had a "significant ownership interest in the corporation," but also had and exercised "control over

22

significant aspects of the corporation's day-to-day functions, including determining employee salaries." Id.; see also Grim Hotel Co., 747 F.2d at 972 (concluding that the defendant was an employer where he began and controlled the hotel corporations, held their purse strings, guided their policies, could authorize compliance with the FLSA, solved major problems, and had "ultimate control over wages"); Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983) (affirming the district court's order concluding that two defendants—who together were the president, treasurer, secretary, and only members of the board of directors—were employers where they maintained offices at the company and "were actively engaged in the management, supervision and oversight" of the company's affairs, "including employee compensation and benefits").

The Sixth Circuit noted in Dole that, "To be classified as an employer, it is not required that a party have exclusive control of a corporation's day-to-day functions. The party need only have operational control of significant aspects of the corporation's day to day functions." Dole, 942 F.2d at 966 (internal quotation marks omitted). For that reason the fact that a payroll bookkeeper handled the details of calculating hours, overtime, and commissions did not prevent the president, who actually decided how much the employee compensation would be, from being an employer. Id.; see also Schultz v. Mack Farland & Sons Roofing

23

Co., 413 F.2d 1296, 1299–1300 (5th Cir. 1969) (finding that the founder, president, and sole investor in two corporations was an employer where he set the management policy for both corporations and exercised authority over the hiring, firing, hours, work assignments, and compensation of supervisory personnel). Nor did it matter in the Dole case that a general manager handled many of the day-to-day problems relating to the operation of the corporation or that branch managers exercised some control over the hours that their employees worked. Dole, 942 F.2d at 966. Because he "was involved in the business operations of the corporation, and he controlled the purse strings of the corporation," the Sixth Circuit held the president in Dole jointly and severally liable as an employer under the FLSA. Id.

Our case, however, is different. There was insufficient evidence for a jury reasonably to conclude that Collins, Sr. was either involved in the day-to-day operation of the Longwood racetrack facility or was directly responsible for the supervision of employees during the relevant years. Perez introduced no evidence to contradict the uniform testimony of Collins, Sr., of Tom Bowersox, and of Jack Collins, Jr. that since Collins, Sr. suffered a heart attack in 1998, his sons had run the business and made all the decisions about hiring and firing and compensation. Perez was left to rely on Collins, Sr.'s official position as managing agent under

24

the agreement between Kennel Club and CCC Racing, but as our <u>Patel</u> decision establishes, that is not enough.

The district court correctly granted Collins, Sr.'s motion for judgment as a matter of law on the issue involving his individual liability.

**IV.**

Perez also contends that the district court erred in finding that the defendants acted in good faith, which was the basis for the court's decision not to award liquidated damages against them. This contention focuses on the inconsistency between that finding by the judge and the jury's earlier finding that the defendants' violations were willful, which it implicitly made in the course of deciding on the length of the statute of limitations period. Perez argues that the court's finding of good faith cannot be reconciled with the jury's finding of willfulness and must yield to it. If so, it was error for the district court not to assess liquidated damages.

The seed bed that gave rise to this conflict between findings lies in having the judge and jury answer what is essentially the same question for two different purposes. The willfulness or good faith question is answered first by the jury to determine the period of limitations and then, if there is a verdict for the employee, again by the judge to determine whether to award liquidated damages.

25

The statute of limitations for claims seeking unpaid overtime wages generally is two years, but if the claim is one "arising out of a willful violation," another year is added to it. 29 U.S.C. § 255(a). To establish that the violation of the Act was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 1681 (1988). The Code of Federal Regulations defines reckless disregard as the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. Where the jury decides willfulness for statute of limitations purposes, see Fowler v. Land Mgmt. Groupe, Inc., 978 F.2d 158, 163 (4th Cir. 1992), it will be called upon to do so in cases, like this one, where the failure to pay overtime occurred more than two years before the action was filed.[3] That is one side of the potential conflict.

The other side of the potential conflict is that the Act assigns to the judge the role of finding whether the employer acted in subjective and objective good faith for liquidated damages purposes. See 29 U.S.C. § 260. When the jury finds an

---

[3] We have been unable to find an FLSA decision of this Court squarely holding that the decision about whether the employer acted willfully for purposes of determining the statute of limitations period is to be decided by the jury. In the district court, the court and the parties assumed that the jury was to decide willfulness, and the parties have assumed that in their briefs and arguments to us. So, we assume it too.

26

employer has violated the overtime provision of the FLSA and assesses compensatory damages, the district court generally must add an award of liquidated damages in the same amount, which doubles the total damages awarded. 29 U.S.C. § 216(b) ("Any employer who violates the provisions of [the FLSA] . . . shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."); see also Dybach v. State of Fla. Dep't of Corr., 942 F.2d 1562, 1566–77 (11th Cir. 1991). There is, however, a good faith defense, which gives the court discretion to reduce or deny an award of liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C. § 260. The employer bears the burden of establishing both the subjective and objective components of that good faith defense against liquidated damages. Dybach, 942 F.2d at 1566; Spires v. Ben Hill County, 980 F.2d 683, 689 (11th Cir. 1993).

We discussed this conflict of findings issue in our recent decision in another FLSA overtime wages case. See Rodriguez v. Farm Stores Grocery, Inc., ___ F.3d ___ (11th Cir. 2008). There we had the flip side of the present circumstances. The

employer in Rodriguez contended that because the jury had found that the violation of the overtime provision had not been willful for statute of limitations purposes, the judge was required to find that the employer had acted in good faith for liquidated damages purposes. Id. at ___.

We found it unnecessary to decide in Rodriguez whether the judge could make a finding on good faith inconsistent with the jury's finding on willfulness, because the different burdens of proof meant that the findings in that case were not inconsistent. Id. at ___. Viewed in light of which party had the burden, the jury's finding was that the employee had not proven by a preponderance of the evidence that there was willfulness, while the judge's finding was that the employer had not proven by a preponderance of the evidence that there was a lack of good faith. Id. at ___. As we explained, the two findings were not inconsistent because a reasonable factfinder could have found the evidence to be in equipoise on the willfulness/good faith question, with the result that the employee had not proven willfulness at the same time the employer had not proven good faith. Id. at ___. In other words, it is logically possible for the losing side to have varied with, because it depended on, the burden of proof.

That theory of reconciliation will not work in the present case. The jury's verdict on the statute of limitations issue amounts to a finding that the employee

28

carried his burden of proving willfulness, while the judge's decision on the liquidated damages issue amounts to a finding that the employer carried its burden of proving good faith. Both findings rule out any equipoise in the evidence. Because the burden of proof is different, two negative findings, which is what we had in Rodriguez, may be explained by positing an evenness of the evidence; two positive findings, which is what we have here, cannot be. So, the issue that was not presented in Rodriguez is squarely presented here: Does the jury's finding that willfulness has been proven by the employee preclude the judge from finding that good faith has been proven by the employer?

We have not decided this issue in the FLSA context, but we have resolved closely analogous issues in the Equal Pay Act and Age Discrimination in Employment Act contexts. See Glenn v. Gen. Motors Corp., 841 F.2d 1567 (11th Cir. 1988); Castle v. Sangamo Weston, Inc., 837 F.2d 1550 (11th Cir. 1988). The Equal Pay Act amended § 206 of the FLSA to prevent pay discrimination based on sex, and the FLSA's statute of limitations and liquidated damages provisions apply to EPA claims. See 29 U.S.C. §§ 206(d)(3), 216(b), 260. In the Glenn case, which was litigated before there was a right to a jury trial in EPA actions, the district court found in deciding the length of the limitations period that the employer had acted willfully in violating the statute, and it found in awarding liquidated damages

that the employer had not proven that it acted in good faith. Glenn, 841 F.2d at 1573. The employer contended on appeal that the district court should not have awarded liquidated damages, but we rejected that contention for two alternative reasons. Id. One was that there was sufficient evidence to support the district court's finding that the company had not acted in good faith. Id.

The second reason we gave for affirming the award of liquidated damages in Glenn was that a finding the defendant had acted willfully for statute of limitations purposes precludes a finding that it acted in good faith for liquidated damages purposes. Id. at 1573 n.14 (explaining "that our conclusion in the context of the discussion on the statute of limitations issue that GM's actions met [the] . . . definition of 'willful' precludes a finding of good faith on the part of GM"); see also EEOC v. City of Detroit Health Dep't, Herman Kiefer Complex, 920 F.2d 355, 358 (6th Cir. 1990) ("Since the jury determined that the City's violation of the Equal Pay Act was willful, and since the district court was, in determining whether the violation was in good faith and with reasonable grounds, presented with the same issue, the district court was bound by the jury finding."). The preclusion holding in Glenn was an alternative one, but alternative holdings are binding precedent. Massachusetts v. United States, 333 U.S. 611, 623, 68 S. Ct. 747, 754 (1948); Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 340, 48 S. Ct.

30

194, 196 (1928); Johnson v. DeSoto County Bd. of Comm'rs, 72 F.3d 1556, 1562 (11th Cir. 1996); McLellan v. Miss. Power & Light Co., 545 F.2d 919, 925 n.21 (5th Cir. 1977).

Of course, we did not have the jury versus judge aspect of the question in the Glenn case. But we did have it in the Castle ADEA case. That statute provides for liquidated damages only where the defendant's violation was "willful." 29 U.S.C. § 626(b). For purposes of that provision, the Supreme Court had defined willfulness as meaning that the defendant "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128–29, 105 S. Ct. 613, 625–26 (1985). That is the same definition of willfulness that applies to the FLSA's statute of limitations provision. McLaughlin, 486 U.S. at 135, 108 S. Ct. at 1682.

That willfulness has the same meaning under both the FLSA and the ADEA is important for our purposes, because we pointed out in Castle that when a jury finds that a defendant's violation is willful for statute of limitations purposes, "it has already factored the possibility of good faith into its examination." Castle, 837 F.2d at 1561. We held that a jury's finding of willfulness deprives the district court of any discretion to reduce liquidated damages based on its own finding of

31

good faith.[4] Id. We explained that holding this way: "Not only would a district court impermissively be making a finding contrary to the jury's findings, but under the Thurston definition to find 'good faith' after a finding of 'willful' violation is illogical; the two terms are now mutually exclusive." Id. (internal citation omitted); see also Spanier v. Morrison's Mgmt. Servs., 822 F.2d 975, 979 (11th Cir. 1987) ("We hold that the existence of a jury issue of willfulness under the Thurston standard divests the district court of discretion to reduce an ADEA liquidated damages award."); Lindsey v. Am. Cast Iron Pipe Co., 810 F.2d 1094, 1098 (11th Cir. 1987) ("[I]t is well-settled that the court may not make findings' contrary to or inconsistent with the jury's resolution . . . of that same issue as implicitly reflected in its general verdict . . . ." (internal quotation marks and

---

[4]    Before the Supreme Court's decision in Thurston, this Court used in ADEA cases the "in the picture" standard of willfulness, which asked whether the employer knew or suspected that the conduct might violate the Act. See Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir. 1972). With that very broad definition of willfulness in place, our circuit law permitted the district court to reduce or deny liquidated damages based on a finding of good faith even where it had been determined that the employer willfully violated the ADEA. In Hays v. Republic Steel Corp, 531 F.2d 1307 (5th Cir. 1976), considering the applicability of the good faith defense in 29 U.S.C. § 260 to the ADEA, we held that the discretion of the district court under § 260 to reduce or deny liquidated damages based on a showing of good faith applied to ADEA cases. Id. at 1312. Under the Jiffy June standard, a finding of willfulness and a later finding of good faith were not contradictory. An employer could know that there was a possibility it was violating the Act but still have a good faith belief that it was not.

However, after the Supreme Court narrowed the definition of willfulness in Thurston, we determined that the Supreme Court had "disapproved this court's definition of willfulness and, by implication, disapproved the discretion that this court had vested in district courts to reduce the liquidated damages award on a finding of good faith." Spanier v. Morrison's Mgmt. Servs., 822 F.2d 975, 979 (11th Cir. 1987). In other words, Thurston's narrowing of the definition of willfulness made it and good faith mutually exclusive.

citation omitted) (ellipsis in original)); <u>Powell v. Rockwell Int'l Corp.</u>, 788 F.2d 279, 287 (5th Cir. 1986) (affirming the district court's award of liquidated damages in an ADEA case because under "the <u>Thurston</u> rule . . . 'good faith' can no longer coexist with 'willfulness'" and concluding that "a further examination of good faith becomes irrelevant because it has already been factored into the <u>Thurston</u> 'willfulness' definition" by the jury).

We conclude, based on the reasoning and holdings of our <u>Glenn</u> and <u>Castle</u> decisions, that in an FLSA case a jury's finding in deciding the limitations period question that the employer acted willfully precludes the court from finding that the employer acted in good faith when it decides the liquidated damages question. Our conclusion puts us on what appears to be the majority side of the circuit split on this issue. <u>Compare</u> <u>Singer v. City of Waco, Tex.</u>, 324 F.3d 813, 823 (5th Cir. 2003) (affirming an award of liquidated damages where the jury had found that the defendant's violation of the FLSA was willful, because the defendant could not show it had acted in good faith), <u>and</u> <u>Chao v. A-One Med. Servs., Inc.</u>, 346 F.3d 908, 920 (9th Cir. 2003) (affirming an award of liquidated damages under the FLSA where there had been a finding of willfulness, and noting that "a finding of good faith is plainly inconsistent with a finding of willfulness"), <u>and</u> <u>Herman v. Palo Group Foster Home, Inc.</u>, 183 F.3d 468, 474 (6th Cir. 1999) (affirming a

33

district court's award of liquidated damages for violations of the FLSA and concluding that "a finding of willfulness is dispositive of the liquidated-damages issue"), and Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 120 (2d Cir. 1997) (finding in an EPA case that an employer had acted willfully for purposes of the statute of limitations, "and the resulting compensatory award should be doubled pursuant to the Fair Labor Standards Act's liquidated damages provision" under 29 U.S.C. § 260), and Brinkman v. Dep't of Corr., 21 F.3d 370, 372 (10th Cir. 1994) (determining that the district court "properly awarded liquidated damages based upon the jury's finding of willfulness" because "when fact issues central to a claim are decided by a jury upon evidence that would justify its conclusion, the Seventh Amendment right to a jury trial prohibits the district court from reaching a contrary conclusion"), with Broadus v. O.K. Indus., Inc., 226 F.3d 937, 944 (8th Cir. 2000) (noting in an EPA case that the "jury's decision on willfulness is distinct from the district judge's decision to award liquidated damages" (citation omitted)), and Fowler, 978 F.2d at 163 (determining in an EPA case that in light of "the explicit language of section 260, expressly vesting discretion to award liquidated damages in the hands of the trial judge . . . Congressional intent would [not] be effectuated by a scheme in which, in every case, the trial court's discretion to award liquidated damages would be completely

34

constrained by the jury's determination on 'willfulness' for purposes of the statute of limitations").[5]

We reject the defendants' argument that the district court was empowered to decide the good faith question and decline to award liquidated damages because of the evidence that they had consulted an attorney and their payroll company about whether they qualified for the recreational and amusements exemption and had been advised that they did.  Given our holding that a jury's finding of willfulness forecloses a judge from finding good faith, evidence that an employer acted without willfulness and in good faith makes a difference at this stage only if that evidence compels judgment as a matter of law for the employer.  In deciding that question we apply the usual standard of  whether "no jury reasonably could have reached a verdict for the plaintiff" on the claim or defense.  <u>Collado v. United Parcel Serv., Co.</u>, 419 F.3d 1143, 1149 (11th Cir. 2005).  We apply that standard

---

[5] The Fourth Circuit misspoke when it said in <u>Fowler</u> that the majority position on this issue results in "a scheme in which, in every case, the trial court's discretion to award liquidated damages would be completely constrained by the jury's determination on 'willfulness' for purposes of the statute of limitations." <u>Fowler</u>, 978 F.2d at 163.  There will not be a statute of limitations issue for the jury to decide "in every case."  Even in the subset of cases where there is a statute of limitations issue, a decision by the jury that the employee has failed to carry his burden of proving willfulness will not constrain the judge's decision on whether the employer has carried its burden of proving good faith for liquidated damages purposes.  Only in those cases where there is a statute of limitations issue and where the jury decides that issue by finding that the employee has proven the employer acted willfully will the judge's decision on the liquidated damages issue be constrained.

de novo and must draw all inferences in favor of the prevailing party, id., here the plaintiff.

The defendants presented testimony on this issue from three witnesses. Gray Laney, a CPA who worked for both Kennel Club and CCC Racing, testified that he had always thought that the companies were exempt from paying overtime. He said that he had discussed the matter with a sales representative of Paychecks Business Solutions, their payroll company, who reviewed it with an unidentified person in his company. They were of the opinion that Kennel Club and CCC Racing were exempt, but that was based on the assumption that the two were separate entities, which in turn was apparently based on the further assumption that the two companies did not intermingle any of their money. As we have already noted, however, the evidence at trial, viewed in the light most favorable to Perez, showed that the two companies shared a single credit card, that CCC Racing controlled Kennel Club's operating cash, and that money from Kennel Club's operating accounts was recorded as a payable on CCC Racing's books. See supra at ___.

Charles Neilson, another CPA and business consultant for Kennel Club and CCC Racing, testified that he had gotten a verbal opinion from Bill Kalish, an attorney who did work for the Collins family, about whether the companies

36

qualified for the recreational and amusement exemption. Based on what Neilson had told him, Kalish advised that the exemption applied and he passed that advice along to principals in the companies. Although he testified that Kalish was aware of how the companies had been set up, Neilson did not testify that Kalish knew that one controlled the other's operating cash or about how the money of one was treated as a payable on the other's books.

The final witness to testify for Kennel Club and CCC Racing on this issue was Jack Collins, Jr. He testified that after he set up CCC Racing he personally called Bill Kalish for advice about whether the two companies were exempt, and Kalish advised him that they were exempt. He also said that he had received the same advice from his payroll company. His testimony, however, does not indicate what, if anything, he disclosed to attorney Kalish or the payroll company about the financial inter-relationships and dealings between the companies.

All three of these witnesses were cross-examined, and the jury had an opportunity to observe their demeanor and come to a conclusion about their credibility. The jury could have been persuaded not to believe the testimony of these witnesses for several reasons. One is that the attorney Bill Kalish, on whose opinion Kennel Club and CCC Racing supposedly relied, did not testify. At the time of this trial, which was held in Orlando, Kalish's office was eighty or ninety

37

miles away in Tampa.  He did legal work for the companies and their principals, and they could have called him as a witness.  They failed to do so, and no explanation for that failure appears in the record.

The same is true of the failure to call the person at the payroll company who supposedly advised Kennel Club and CCC Racing that they were exempt.  That person was not called and, again, no explanation for the failure to do so appears in the record.  The jury could have found it telling that neither of the two people who allegedly arrived at the opinion on which Kennel Club and CCC Racing relied was called to testify that he actually did render that opinion or the basis for it.

The jury also justifiably could have been skeptical about the opinion because it was not reduced to writing by either attorney Kalish or the unidentified person at the payroll company, or otherwise reflected in any document.  But even if the jury credited all of the testimony of the three witnesses who testified about the opinions, it still reasonably could have concluded that Kennel Club and CCC Racing acted willfully, because they and those acting on their behalf failed to supply Kalish and the payroll company with all of the information needed to arrive at an informed opinion on the subject.

For these reasons, we conclude that the jury reasonably could have concluded that Kennel Club and CCC Racing's violations of the FLSA were

38

willful. The evidence did not compel the jury to reach the contrary conclusion. And, as we have already explained at some length, the jury's finding on that willfulness issue ruled out a later finding by the judge of good faith. It follows that the district court erred by denying Perez's motion for liquidated damages.

## V.

In conclusion, we **AFFIRM** the judgment of the district court insofar as it denies Kennel Club and CCC Racing's motions for judgment as a matter of law and grants Collins, Sr.'s renewed motion for judgment as a matter of law. We **REVERSE** the judgment of the district court denying liquidated damages and **REMAND** for entry of a judgment that includes liquidated damages.