[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-14024

_____

SYDNEY MARIE KEEFE,

Plaintiff-Counter Defendant-Appellee,

*versus*

BRITT'S BOW WOW BOUTIQUE, INC.,
MERRI COLVARD,

Defendants-Counter Claimants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-62138-WPD

_____

_____

No. 24-11252

_____

SYDNEY MARIE KEEFE,

Plaintiff-Counter Defendant-Appellee,

*versus*

BRITT'S BOW WOW BOUTIQUE, INC.,
MERRI COLVARD,

Defendants-Counter Claimants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-62138-WPD

_____

Before ROSENBAUM, BRANCH, and KIDD, Circuit Judges.

PER CURIAM:

Following a jury trial, the district court entered a $104,000 judgment for Plaintiff Sydney Keefe against Defendants Britt's Bow Wow Boutique, Inc. ("BBWB") and its owner Merri "Chris" Colvard for willfully violating the Fair Labor Standards Act of 1938

("FLSA"), 29 U.S.C. §§ 201 *et seq.* The court denied Defendants' motions for judgment as a matter of law, a new trial, and remittitur. It also awarded Keefe, as the prevailing party, $12,575.63 in costs and $78,337.50 in attorney's fees. Defendants appeal the denial of their three motions and the award of costs and attorney's fees.[1]

After careful review, we conclude that Keefe presented sufficient evidence to support her claim, the trial was fundamentally fair, and the award of costs and fees was reasonable. So we affirm the judgment and award of costs and fees.

## I.    BACKGROUND

Chris Colvard owns BBWB, a pet kenneling, boarding, and domestic and international transportation business headquartered in Michigan. From March 2021 until October 2022, Sydney Keefe worked and sometimes lived at the Miami, Florida, location of BBWB. Keefe's responsibilities centered on running day-to-day operations at the Miami location, including taking dogs to the vet, transporting dogs to and receiving them at the airport, and driving dogs across Florida.

---

[1] Defendants brought their appeal of the award of costs and fees separately from their appeal of the judgment. For the speedy and efficient resolution of Defendants' appeals, this Court *sua sponte* consolidates and resolves the two appeals before us (case numbers 23-14024 and 24-11252) with this single opinion. *See Positano Place at Naples I Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, 84 F.4th 1241, 1244 n.1 (11th Cir. 2023) (consolidating, *sua sponte*, cases for the purpose of resolving the appeals).

On November 16, 2022, Keefe filed a complaint in the United States District Court for the Southern District of Florida, alleging that Colvard and BBWB knowingly and willingly failed to pay her overtime wages in violation of the FLSA. She alleged that she was entitled to damages of approximately $29,350.27, half of which account for 71 weeks' worth of unpaid overtime wages and half for liquidated damages.[2] But she reserved that she based this figure on averages, estimates, and approximations that might change with information produced during discovery. In their answer, Colvard and BBWB raised counterclaims against Keefe for fraud, conversion, and unjust enrichment.

### A. Pretrial Disputes

Before the case proceeded to trial, the parties had several pretrial disputes. But for purposes of this appeal, only two are relevant. First, during discovery, Colvard and BBWB asked Keefe in an interrogatory, "[f]or each pay period that [Keefe] believe[d] [she was] entitled to overtime pay that [she] did not receive," to "identify . . . [t]he pay period; . . . [t]he amount of overtime pay [she] claim[ed] [she] did not receive; and . . . [t]he documents that support [her] answer . . . ." Keefe answered that she "estimate[d] that she worked an average of 74 hours per week during the period of March 2, 2021 through June 26, 2022." She also cited documents

---

[2] Keefe based this figure on estimated regular hourly wages of $12.16 for 70 weeks and $11.89 for one week. Those numbers result in overtime rates, priced at one-and-a-half times the regular rates, of $18.24 and $17.84, respectively. Keefe alleged she worked an average of 74 hours per week.

that both parties produced, as to what BBWB actually paid her. Keefe stated her unpaid overtime was "the difference between the 34 hours of overtime Plaintiff estimates she worked on average each week and the amount of overtime wages Defendants paid."

Because Keefe provided only an average amount of overtime she worked, Defendants moved, in relevant part, to prevent Keefe from introducing any evidence at trial as to any specific number of hours she worked overtime in any pay period. The district court referred the motion to a magistrate judge. And the magistrate judge ordered that Keefe would be "precluded from introducing at trial evidence of any specific number of hours she worked overtime for any week or pay period." The court cited Federal Rule of Civil Procedure 37(c)(1). That rule states that "[i]f a party fails to provide information" required in discovery, "the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless . . . ."

But as things turned out, during discovery, Colvard and BBWB, themselves, produced relevant time sheets and payment records. Specifically, they produced QuickBooks records showing when Keefe clocked in and ADP payroll records showing the hours for which they paid her. Keefe moved to introduce these records as evidence at trial. But Defendants objected that the court's earlier order precluded her from using them. The district court ruled that Keefe could use this evidence because Defendants—not Keefe—were the ones who produced the records in discovery. The court explained that, although Keefe couldn't introduce new evidence

she failed to disclose in discovery, it was fair game to use the defense's own records.

That was the first pretrial dispute. Now, we move to the second one. It concerned an issue over when Keefe filed her list of trial exhibits and witnesses. In its trial order, the district court ordered the parties to meet at least one month before the beginning of trial to confer on the preparation of a pretrial stipulation. That date was around August 25, 2023, and the pretrial stipulation was due September 8. By local rules, the parties were to attach their list of trial exhibits and witnesses to their pretrial stipulation. But neither party reached out to the other until Defendants' counsel emailed Keefe's counsel on September 5, three days before the stipulation and exhibits were due.

Having failed to confer with Keefe on a joint pretrial stipulation, on September 8, Colvard and BBWB filed a separate pretrial statement with a list of exhibits and witnesses. Keefe, on the other hand, responded to the email on September 7. She said she would move for an extension on the joint pretrial stipulation. The district court ultimately denied that extension. But Keefe filed her own unilateral pretrial statement along with her trial exhibits and witness lists late on September 21, five days before trial. There, she listed 131 exhibits totaling over 4,000 pages. And on September 24, two days before the start of trial, Keefe added another exhibit of about 2,000 pages.[3] But all the listed exhibits had previously been

---

[3] The day before trial was the Jewish holiday of Yom Kippur, which Defendants' attorney observes.

disclosed in discovery in whole or in part. Still, on September 22, Colvard and BBWB moved for an at least two-week continuance of trial, which the district court denied.[4]

At trial, Keefe ultimately introduced into evidence just four of her exhibits: the QuickBooks records, the ADP payroll records, earnings records BBWB kept of Keefe's pay, and two text messages where Keefe asked Colvard about her overtime pay. When Keefe introduced the QuickBooks records, Colvard and BBWB objected in part because Keefe filed the trial exhibit list late. They similarly objected to the late disclosure when Keefe called a former coworker of hers, Adrian Forbes, to testify. But the district court overruled these objections.

### B. Trial

That brings us to the evidence the parties presented at trial. We summarize it as relevant to this appeal. We start with Keefe's testimony. For discussion purposes, she broke her employment with BBWB into four periods. During the first period, from March 2021 until September 2021, Defendants had Keefe track her hours with the QuickBooks application. But Keefe testified that she worked more hours than these records reflected. The records recorded only hours for discrete work assignments, but not other work Keefe did for the business in between. And when Keefe's QuickBooks entries showed she worked more than 40 hours a

---

[4] In their brief, Colvard and BBWB assert the requested continuance was for 30 days, but the record shows they requested only at least two weeks.

week, BBWB's ADP payroll records showed BBWB paid her for just 40 hours.

According to Keefe's testimony, the second period began when Colvard told her to stop reporting her hours in QuickBooks. It ran from September 2021 until January 2022. With some exceptions, during this period, the ADP payroll records showed BBWB paid Keefe for exactly 40 hours of work each week. But Keefe testified she worked for more hours than that on a regular basis. BBWB did not track her hours at all during that period, except for a few occasional handwritten time sheets Keefe made to ensure overtime payment.

Keefe testified that the third period began when "[Colvard] got tired of [Keefe] asking about [her] overtime constantly," and Colvard told Keefe she was going to pay her a flat rate. It ran from January 2022 through June 2022. The ADP pay records show Keefe worked either 40 or zero hours. She received a gross pay of $800 for one week and $900 for each later week with almost always no input for her hourly rate.[5]

As for the fourth period, it began, according to Keefe's testimony, when Keefe asked for overtime pay and Colvard told Keefe she "would never be working overtime again because [she] was ungrateful for all the hours that [she] was given in the first place." That period extended until the conclusion of Keefe's employment

---

[5] The rate was inputted for one week between May 2 and May 8, 2022, where it was listed at $22.50 per hour.

in October 2022. Keefe worked substantially fewer hours during this period, with Colvard having Keefe work overtime only when she absolutely needed her to. Still, Colvard did pay Keefe overtime during this period. But Keefe testified that "every single time that [she] was being paid overtime [she] would get threatened that [she] would lose [her] job because of the overtime that [she] was making."

At trial, Keefe sought unpaid overtime for only the first three periods. During that time, Keefe testified she worked 10–12-hour days, an average of 74 hours per week—34 hours overtime weekly. She testified that she was "on call 24/7," including at odd times in the middle of the night, as the QuickBooks records available for the first period reflected. And she was usually the only one working at the Miami location. So she was responsible for taking care of and transporting 20 to 30 dogs at a time by herself.

Keefe further testified that Colvard directly supervised her, including her hours, work, duties, and pay. As part of this arrangement, Keefe checked in with Colvard for everything she did. She also testified that she frequently complained to Colvard about unpaid overtime, though she worried she'd lose her job each time she brought up the matter with Colvard. To corroborate this testimony, Keefe introduced as evidence two text messages where she asked Colvard about her unpaid overtime pay.

Keefe explained that Colvard often ignored her complaints about her overtime, and Colvard never paid her overtime at a rate of 1.5 times her regular hourly rate. Colvard paid Keefe only

through the ADP payroll and occasionally through Venmo. And those Venmo payments were for work-related expenses and for limited amounts of overtime at her regular, rather than time-and-a-half, rate.

Besides her own testimony, Keefe presented Adrian Forbes as a witness. Forbes worked as a driver in Florida for BBWB. He testified that Keefe worked more than 40 hours a week, at all times day and night. He also testified that Colvard does not pay overtime, and he was suing her for unpaid overtime as well.

For the defense, Megan Fleming, Michael McKinstry, Doris Silcox, and Colvard testified. Fleming was another employee at BBWB who originally worked in Michigan but later moved to Miami. She testified that Colvard was "a really great employer," who paid her overtime when she owed it. But when pressed for the overtime rate at which she was paid, Fleming revealed Colvard sometimes paid her at her regular hourly rate and sometimes at a rate that she could not recall. Colvard paid Fleming this overtime payment through cash, Venmo, or Cash App, and BBWB's ADP payroll records did not reflect it.

Fleming also testified that Keefe, whom Fleming hired for BBWB, never complained about unpaid overtime. Instead, supported by text messages in the record, Keefe more frequently complained she did not get enough hours of work. And Fleming testified that Keefe had a history of overreporting hours she worked.

Besides Fleming, Michael McKinstry testified for the defense. McKinstry drove dogs and built crates for BBWB, including

at the Miami location where he temporarily stayed and worked with Keefe. He testified that he saw Keefe punched in but not working. But when asked for an example, he mentioned a day when no animals were present to care for, she slept for a portion of it, and he did not know if she punched in. He also testified that Keefe performed unsatisfactory work. And he said that, based on his perceptions, there wasn't enough work to do 70 or 90 hours a week. Finally, he offered that Colvard would not intentionally refuse to pay someone for their work.

Next, Doris Silcox testified. She is a Michigan-based remote employee and has served as a human-resources coordinator of BBWB since December 2021. She came on board after the company stopped using QuickBooks. And she testified that when she began working with BBWB, Keefe was a salaried, not hourly, employee.

Silcox also acknowledged that Keefe switched to an hourly system of tracking her hours in July 2022 through ADP's system. And after that date, Keefe reported multiple problems with ADP's timekeeping system to Silcox. Still, on only one occasion, Keefe complained that a substantial number of her hours—five—were missing from her log in the ADP system. Silcox expected Keefe would have complained more to her had Keefe had unreported overtime, since Silcox handled all problems with BBWB's ADP system. She also explained that Colvard had to approve any time adjustments to an employee's record of over an hour.

Silcox considered Keefe's claim that she worked an average of 74 hours per week to be "an absolutely ludicrous statement." Plus, she testified that Colvard told her Colvard paid Keefe in cash for any work over 40 hours a week, as Keefe requested. But she also admitted to receiving a text from Keefe, where Keefe expressed fear of being fired for reporting overtime. She jokingly responded to that message, "Us both."

Finally, Silcox also said that at one point, someone manually increased Keefe's hours without her knowledge. ADP reported it was Keefe, which was the reason BBWB dropped Keefe's hours substantially in the fourth period of her employment.

Lastly, we have Colvard's testimony. She confirmed that Keefe was her point person running the Miami location of BBWB. When asked if she paid Keefe overtime at 1.5 times her regular rate, she said she paid Keefe "whatever she told me I owed her." She explained she paid Keefe overtime in both Venmo payments and cash. Colvard gave Keefe cash when she went to Miami from Michigan almost every weekend for months. That was Keefe's preferred means of overtime pay, according to Colvard. But Colvard said Keefe never asked Colvard to stop paying her by Venmo. Nor did she complain she was not properly paid after receiving overtime pay. Colvard never consulted with an attorney to make sure these pay practices complied with the FLSA.

Colvard also testified that Keefe occasionally submitted handwritten timecards outside the ADP or QuickBooks systems. She never told Keefe to not record her time. And she asked Keefe

to notify her if her hours got close to 40 hours a week, so Colvard could assign someone else a task and avoid overtime pay.

In certain instances, Keefe also billed hours at an amount Colvard did not think the tasks she had could support. In one instance, for example, Colvard visited the Miami location and found it filthy. Colvard had to clean the kennel herself while Keefe completed no work while remaining punched in.

As for Keefe's shift to "salary" from an hourly rate, Colvard said that she and Keefe agreed to that change after Keefe expressed concerns about working enough hours during the less-busy winter season. And except for one unusual week, Colvard testified, there simply wasn't enough work for Keefe to average as high as 60 hours a week. In fact, Colvard said she couldn't recall a time a "salaried" employee worked over 40 hours. So she did not expect to receive a timesheet from Keefe during this period, although she thought Keefe would speak up if she worked overtime. But Keefe didn't report hours during this period.

After the parties presented their cases, they gave closing statements. During closing statements, another dispute emerged. In her closing statement, Keefe's counsel used an illustrative aid. It showed the calculations for $61,621.10 in damages that Keefe sought from the jury. The aid itself is not preserved in the record, but the description in the trial transcript matches the following chart Keefe included in her brief to this Court:

| Period | Weeks | Average Weekly Hours Worked | Weekly Ovetime Hours Worked | Hourly Rate | Overtime Hourly Rate | Weekly Payroll | Total Venmo Payments for Overtime | Total Unpaid Overtime Wages |
|---|---|---|---|---|---|---|---|---|
| 3/29/21 - 4/25/21 | 4 | | | $15.50 | $ 23.25 | $ 620.00 | $      - | $ 3,162.00 |
| 4/26/21 - 5/2/21 | 1 | | | $16.50 | $ 24.75 | $ 660.00 | $      - | $ 841.50 |
| 5/3/21 - 1/16/22 | 37 | | | $17.50 | $ 26.25 | $ 700.00 | $ 1,440.40 | $ 31,582.10 |
| 1/17/22 - 1/23/22 | 1 | 74 | 34 | $18.50 | $ 27.75 | $ 740.00 | $      - | $ 943.50 |
| 1/24/22 - 1/30/22 | 1 | | | $20.00 | $ 30.00 | $ 800.00 | $      - | $ 1,020.00 |
| 1/31/22 - 6/19/22 | 20 | | | $22.50 | $ 33.75 | $ 900.00 | $      - | $ 22,950.00 |
| 6/20/22 - 6/26/22 | 1 | | | $22.00 | $ 33.00 | $ 880.00 | $      - | $ 1,122.00 |
| | | | | | | | Total = | $ 61,621.10 |

Keefe explained that the regular hourly rates and weekly payroll in the chart came from the ADP payroll records, and the overtime rates were 1.5 times the hourly rate.

Defendants objected. They argued that no evidence of record supported any of the figures in the chart, the chart conflicted with Keefe's complaint, and the chart turned Keefe's closing statement into testimony. But the court overruled the objection. It found the chart a proper "demonstrative aid" and noted Keefe's counsel could "get a whiteboard and just write all this out if he wanted to as part of his argument."[6]

After closing arguments, the court submitted the case to the jury. During its deliberations, the jury wrote a note to the district court. The note asked, "Is it our job to calculate the amount to be

---

[6] The parties and the district court referred to this chart as a "demonstrative aid." Because the 2024 Advisory Committee Notes for the new Rule 107 of the Federal Rules of Evidence have refined the terminology for some types of evidence, we refer to the aid as an "illustrative" exhibit. *See* FED. R. EVID. 107 ("'Demonstrative evidence' is a term better applied to substantive evidence offered to prove, by demonstration, a disputed fact." We refer to an "aid to help the trier of fact understand the evidence or argument" as an "illustrative aid.").

awarded to Sydney Keefe or should we stick to set amount of $61,621.10?  Are we able to see chart"?  The district court declined to provide the chart to the jury.  It explained that the chart was not evidence.  The court also instructed the jury that it was up to the jury to calculate damages.

The jury returned a verdict for Keefe.  It found that Colvard and BBWB willfully violated the terms of the FLSA with respect to overtime pay, owed Keefe $52,000 in damages, and did not successfully prove their counterclaims.  Because the jury found a willful violation of the FLSA, the district court doubled Keefe's damages to $104,000 to account for liquidated damages under the statute.

### C. Post-judgment Motions for Relief

Before the court entered judgment, when Keefe rested, Colvard and BBWB moved for judgment as a matter of law.  The district court denied that motion.  So post-judgment, Colvard and BBWB renewed their motion for judgment as a matter of law on Keefe's FLSA claim.  Defendants argued that (1) the evidence at trial was insufficient to establish an overtime-wages claim under the FLSA, let alone liquidated damages; (2) the court shouldn't have allowed Keefe to present evidence of damages at trial; (3) the evidence Keefe presented at trial on damages was unduly speculative; and (4) the district court erroneously permitted Keefe's counsel to rely on a "demonstrative" exhibit on damages during closing argument.  They also moved for a new trial on the grounds that the district court erred by (1) not granting their motion for a continuance because they were prejudiced by Keefe's late filings and

trial disclosures, and (2) overruling objections at trial to testimony and evidence on the hours Keefe worked. Besides these motions, Defendants moved for remittitur where they sought to amend the damages award to $14,674.14. That amount comes from Keefe's original statement of claim attached to her complaint, minus liquidated damages.

The district court denied these motions. It explained that "[t]here was ample non-speculative, admissible evidence presented at trial to support the elements of an FLSA overtime claim . . . ." "The demonstrative exhibit . . . was based upon evidence at trial," the awarded damages fell "within the range of permissible unpaid overtime based on the evidence adduced at trial," and "[l]iquidated damages was appropriate here, based upon the jury's finding of willfulness . . . ." As for the additional grounds in the motion for new trial, "both parties contributed to the lack of a timely Pretrial Stipulation and, with it, the lack of a timely exchange of exhibit lists." (internal quotation marks omitted). Plus, the district court noted it "did preclude some evidence from being introduced at trial due to Plaintiff's late filing of her exhibit list." And, the court continued, "most of the trial evidence was produced by Defendants, so they had ample notice of such evidence before the trial date and cannot claim that they were prejudiced or ambushed by their introduction at trial."

### D. Costs and Attorney's Fees

Post-judgment, the district court also awarded $12,575.63 in costs and $78,337.50 in attorney's fees to Keefe, adopting the report

and recommendation of a magistrate judge. The court awarded $402 for a court filing fee and $129 for a service-of-process fee. The remaining awarded costs were copying costs for one paper copy of each of the parties' discovery responses and each of Defendants' trial exhibits, plus three trial binders for Keefe's counsel, witnesses, and the court. The court denied copying costs for an additional copy of each of the parties' discovery responses and a fourth trial binder for Keefe herself. It assessed costs at a rate of $0.15 per black-and-white page and $0.59 per color page, a rate other judges in the Southern District of Florida have adopted.

The court denied an objection that Keefe did not substantiate her copying costs because she provided a chart listing them. It also rejected Defendants' argument that Keefe should not have needed paper copies of discovery responses because Defendants electronically produced all the documents in the case. And the court refused to deny costs based on Defendants' argument that Keefe used only four of her exhibits at trial because "[i]t is not unusual for parties to list more exhibits out of caution than they ultimately end up admitting," and the court wouldn't "speculate as to which exhibits Plaintiff intended to admit." (internal quotation marks omitted).

As for attorney's fees, the court approved 208.9 hours in fees at a rate of $375 per hour. That marked a reduction from Keefe's proposed fees of 299.5 hours at a rate of $400 per hour. The court found $375 per hour to be a reasonable rate based on its personal

knowledge of Keefe's counsel and previous cases where courts awarded that rate to that attorney.

The court rejected Defendants' argument that it should deny attorney's fees altogether because "Plaintiff's attorney's time records [were] grossly inflated" and "patently unreasonable on their face." Rather, the court found that "[b]ased on the information before the Court, this does not appear to be a case that could have been settled for a minimal amount and that Plaintiff's counsel perpetuated simply to generate fees." The court highlighted that the judgment was for $104,000, and Colvard and BBWB did not argue they were willing to settle for any amount before trial. Keefe contended that she attempted to settle before trial, but according to her, Colvard and BBWB consistently refused. And Defendants made their first and only settlement offer while the jury was deliberating.[7]

The court then assessed the appropriate number of hours for which Keefe could recover fees. In reaching 208.9 hours, the court reduced Keefe's counsel's hours billed for document review, hours

---

[7] In their brief, with no citations, Colvard and BBWB assert that "[t]he parties participated in early mediation, but Plaintiff demanded the full amount sought in the complaint **AND** 100% of attorney's fees allegedly incurred at that early juncture of the case [$65,000] . . . . This case should, and would, have settled but for Plaintiff's counsel's conduct." Keefe responds that she never made this demand, and Defendants' counsel should be sanctioned "(1) for violating the confidentiality of mediation, *and* (2) for falsely representing to this Court the substance of those confidential discussions." We do not consider the unsubstantiated allegations raised in Defendants' brief, and because there is no pending motion for sanctions, we do not address whether they are warranted here.

related to Defendants' motions to compel and for sanctions, hours related to motions for extensions of time, and hours related to Defendants' counterclaims. Reviewing the hours billed for document review, the court reduced counsel's entries for reviewing text messages from 49.5 to 10 hours. The court also reduced 26.4 hours to review document productions and purported "newly-discovered evidence" to 10 hours. But it refused to reduce hours billed to review and prepare trial exhibits from 25.3 hours based on Defendants' argument that Keefe introduced only four exhibits at trial. And although Colvard and BBWB complained that Keefe double-billed to review much of the same material, the court found "it reasonable that counsel would review material as he received it . . . ." The court also found it reasonable to bill 2.8 hours to review Defendants' motion for judgment as a matter of law.

But the court refused to grant fees for 8.1 hours of work performed to respond to successful motions to compel discovery and sanctions because they "arose from Plaintiff's failure to respond to Defendants' discovery requests." The court also found it unreasonable to award fees for 2.6 hours on motions for extensions that Keefe sought. And it refused to grant 24 hours in fees for responding to Defendants' counter-claims because Keefe did not point to an applicable statute granting a court the authority to grant fees on these claims, establish the parties contracted for fees, or show Defendants acted in bad faith.

Defendants appeal the post-judgment denial of their motions for judgment as a matter of law, a new trial, and remittitur, and the award of copying costs and attorney's fees.

## II.    STANDARD OF REVIEW

We review de novo the denial of a motion for judgment as a matter of law. *See Bianchi v. Roadway Express, Inc.*, 441 F.3d 1278, 1282 (11th Cir. 2002). Judgment as a matter of law should be granted only when "there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007) (internal quotation marks and citation omitted). When we conduct our review on a motion for judgment of a matter of law, we view all evidence in the light most favorable to the prevailing party at trial. *United States v. Vahlco Corp.*, 720 F.2d 885, 889 (11th Cir.1983).

We review the denial of motion for a new trial for abuse of discretion. *Bianchi*, 441 F.3d at 1282. A party may seek a new trial by arguing that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). But "[b]ecause it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lipphardt v. Durango Steakhouse*

*of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotation marks omitted). And we will reverse for a new trial based on an evidentiary ruling "only in cases where substantial prejudice exists." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1259 (11th Cir. 2004) (citation omitted).

We also review the denial of a motion for remittitur for abuse of discretion. *Goodloe v. Royal Caribbean Cruises, Ltd.*, 1 F.4th 1289, 1292 (11th Cir. 2021). "As a general rule, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farms Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008) (internal quotation marks and citation omitted). We review the evidence in the light most favorable to the jury's verdict. *See id.*

As for the district court's award of attorney's fees and costs, we review that for abuse of discretion. *Johnston v. Borders*, 36 F.4th 1254, 1282 (11th Cir. 2022).

We find an abuse of discretion if the court made "a clear error of judgment, fail[ed] to follow the proper legal standard or process for making a determination, or relie[d] on clearly erroneous findings of fact." *Id.* (internal quotation marks and citation omitted). And "[a] finding of fact—whether adopted by the court from a magistrate judge's report and recommendation or made by the court independently—is clearly erroneous if the evidence, viewed

22                    Opinion of the Court                    23-14024

in the light most favorable to the finding, does not support the find-ing." *Id.*

## III.    DISCUSSION

Colvard and BBWB argue that they are entitled to judgment as a matter of law or a new trial because, they say, Keefe presented no evidence that they had actual or constructive knowledge of her overtime work, that Keefe actually performed uncompensated work, or that she suffered specific damages, let alone that she is entitled to liquidated damages because they willfully violated the FLSA.  They also assert this relief is warranted because the district court allowed Keefe to present previously undisclosed evidence at trial in violation of Federal Rules of Civil Procedure 26 and 37 and to improperly use unadmitted evidence as a "demonstrative aid" during her closing statement.

As for a new trial in particular, Defendants urge that's also warranted because the district court denied their motion for "ad-journment."[8]  And they argue in the alternative, that the evidence supports a damages award of only $14,675.14, the amount that Keefe initially claimed, minus liquidated damages.

Based on Defendants' position that we should reverse or va-cate the district court's judgment, Defendants also argue that Keefe is not the prevailing party, so she is not entitled to costs and fees.

---

[8] We understand the motion Defendants refer to as a motion for "adjourn-ment" to have been a motion for a continuance and refer to it as such.

And even if she is the prevailing party, they say, the district court awarded an unreasonable amount of costs and fees to her.

We conclude that the weight of the evidence supports the jury's verdict, including liquidated damages; the trial below was fundamentally fair; and the assessed costs and fees were reasonable. So we affirm. We address each of Defendants' arguments in turn.

### A. The great weight of the evidence does not defeat the jury's verdict.

Under the FLSA, covered employers must pay their covered employees 1.5 times their regular hourly rate for every hour they work over 40 hours a week. 29 U.S.C. § 207(a)(2). An employee may bring an action against her employer for unpaid overtime wages in federal court. *Id.* § 216(b).

The employee bears the burden to show she did work for which her employer failed to appropriately compensate her. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded on other grounds by* Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251–262. Still, "[d]ue regard must be given to the fact that it is the employer who has the duty . . . to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* at 687. We have long recognized that "[e]mployees seldom keep such records themselves . . . ." *Id.* So we do not expect an employee to keep documentary records of her hours. *See id.*

Instead, "[w]hen the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Id.* But, we've explained, "where the employer's records are inaccurate or inadequate . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* In that case, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687–88. This way we do not "place a premium on an employer's failure to keep proper records" or "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Id.* at 687.

Along the same lines, we have been clear that an employee may meet her burden with her own testimony even if she lacks documentation and is unable to "state with precision the number of uncompensated hours [she] worked . . . ." *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315–22 (11th Cir. 2007) (recognizing plaintiffs met their burden to create a dispute of fact with their testimony as to the general overtime hours they worked uncompensated); *see also Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1315 (11th Cir. 2013) ("[T]here was sufficient testimony regarding the hours . . . regularly worked to allow the jury to approximate the hours [the employees] actually worked in each week

for which they sought to recover unpaid wages."). This is especially true when a plaintiff's "inability to state the hours [she] worked may be at least partly the fault of" her employer. *See Allen*, 495 F.3d at 1317.

Here, Keefe has easily met her burden to establish that the great weight of the evidence does not defeat her claim. Keefe presented evidence that BBWB's records were unreliable. She introduced QuickBooks time records that conflicted with BBWB's ADP payroll records when her hours exceeded 40 hours a week. The ADP payroll records then completely stopped tracking her hours, which Colvard admitted on the stand occurred when she put Keefe on "salary." And Colvard further admitted that she did not keep accurate overtime records because she made ad hoc Venmo or cash payments to her employees, based on what they told her; she didn't pay overtime through the ADP system. Plus, Keefe testified that Colvard instructed her not to report her overtime hours and created a culture of fear for reporting them.

Because Colvard and BBWB did not keep accurate records, Keefe needed only to provide evidence that she "in fact performed work for which [s]he was improperly compensated and . . . sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. She easily cleared that hurdle as well. To prove the amount and extent of the work she performed, Keefe testified that she worked an average of 74 hours a week. She explained how that was possible because her position required her to be on call 24/7, including

26                     Opinion of the Court                    23-14024

in the middle of the night as the QuickBooks records reflected. And as the point person for the Miami office, she was responsible for sometimes 20–30 dogs at a time. Forbes also corroborated Keefe's testimony.

Besides this, Keefe presented evidence that Defendants didn't compensate her for up to $61,621.10 for that work, well above the jury's award of $52,000. The record contains ADP payroll records and Venmo payments that do not add up to the proper compensation had Keefe been paid at time-and-a-half for a weekly average of 34 hours of overtime. Keefe testified that she was never paid overtime at the 1.5-times rate. Forbes testified that Colvard did not pay overtime. And Keefe elicited testimony from Fleming that if Colvard paid her overtime, it was often at the regular hourly rate rather than time-and-a-half. Plus, Colvard testified that she relied on her employees to tell her what overtime was due despite testimony that she created a culture to underreport overtime.

Keefe has met her burden to show the amount and extent of her uncompensated work. Still, as Colvard and BBWB highlight, an employee facing an FLSA claim must also present evidence that could lead "a reasonable jury . . . [to] conclude . . . that [her employer] had actual or constructive knowledge" that she worked without proper compensation. *Allen*, 495 F.3d at 1318. But once again Keefe's case passes that hurdle.

Keefe testified that she frequently complained to Colvard about unpaid overtime. She supported this testimony with two text messages, where Keefe asked Colvard about her unpaid hours.

And Keefe further stated on the record that she checked in with Colvard for all work she performed. With this evidence, a jury could reasonably find that Colvard had actual knowledge.

To be sure, testimony from Fleming, McKinstry, Silcox, and Colvard disputed Keefe's testimony, on which Keefe based much of her case. But it's the jury's job to weigh the credibility of both sides' testimony. And we can't say that the great weight of the evidence calls for a new trial, let alone judgment as a matter of law.

Colvard and BBWB also stress that Keefe provided very little documentary evidence to support her case. But the Supreme Court has instructed us to remember that "[e]mployees seldom keep such records themselves . . . ." *Anderson*, 328 U.S. at 687. Accordingly, we have explained that employees can make their case "with evidence other than precise, written documentation." *Allen*, 495 F.3d at 1317. So Keefe's lack of documentation of her overtime is not unusual and doesn't preclude a jury from finding in her favor.

Next, Defendants argue that Keefe's testimony estimating the hours she worked was not specific enough to support her FLSA claim. But this position too runs headfirst into our precedent. We have long recognized that an employee can meet her burden with testimony estimating the hours she regularly worked. *See, e.g., Guevara v. Lafise Corp.*, 127 F.4th 824, 830–31 (11th Cir. 2025) (accepting the parties' agreement that the employee "worked an average of 57 hours a week which necessarily meant that he had 17 hours of overtime each week"); *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1169, 1190–92 (11th Cir. 2021) (holding that a plaintiff

survived summary judgment where she estimated she spent "between 30 and 50 percent of the time" during "any particular week" performing "sidework" in violation of the FLSA); *Rodriguez*, 518 F.3d at 1267 (affirming denial of summary judgment to an employer where the employees had "sometimes . . . testified to ranges, such as [working] 52 to 60 hours per week").

For their own authority, Colvard and BBWB rely extensively on our decision in *Jackson v. Corrections Corp. of America*, 606 F. App'x 945 (11th Cir. 2015). There, we affirmed the grant of summary judgment to an employer where the employee failed to meet her burden under the FLSA. *Id.* at 952–53. And Colvard and BBWB claim Keefe has presented similarly insufficient evidence.

As an unpublished decision, *Jackson* in no way binds us here. But the case is also easily distinguishable. There, the plaintiff "never stated with any clarity or precision the number of hours she allegedly worked, the amount or nature of that work, where or when the work was completed, or anything else that would assist a factfinder in approximating [her] unpaid overtime." *Id.* at 952. But Keefe consistently testified she worked an average of 74 hours each week from March 2021 to June 2022 and explained in detail the nature and extent of her responsibilities that led to that figure. The plaintiff in *Jackson* also failed to record her overtime when timesheets were indisputably provided to her. *Id.* But Keefe recorded her overtime to Colvard's specifications when the QuickBooks system was active and then stopped reporting when Colvard

instructed her to.  In short, the record here is materially different than the record in *Jackson*.

Because Keefe presented ample, non-speculative evidence to support her FLSA claim, Colvard and BBWB are not entitled to judgment as a matter of law nor a new trial.

### B. Keefe's evidence supports the award of liquidated damages.

By proving her claim to unpaid overtime wages, Keefe has also provided sufficient evidence to support the award of an additional $52,000 in liquidated damages.  "Under the FLSA, liquidated damages are presumptively available." *Gelber v. Akal Sec., Inc.*, 14 F.4th 1279, 1288 (11th Cir. 2021).  That's because the text of the statute allows employees to recover damages in "the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  So by proving her claim, Keefe has also presumptively proved her entitlement to liquidated damages.

Still, the FLSA allows the court to exercise its discretion to deny liquidated damages when an *employer* shows his actions were "in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [Act] . . . ." *Id.* § 260. The burden falls on the employer to establish the components of this good-faith defense.  *Gelber*, 14 F.4th at 1288.  Generally, the FLSA "assigns to the judge the role of finding whether the employer acted in . . . good faith for liquidated damages purposes." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163

(11th Cir. 2008); *see* 29 U.S.C. § 260.  But the jury gets to decide whether an employer's violation of the FLSA was "willful"—if so, the statute of limitations for the plaintiff's claim is extended from two to three years.  29 U.S.C. § 255(a); *see Alvarez Perez*, 515 F.3d at 1162–63.  And "a jury's finding in deciding the limitations period question that the employer acted willfully precludes the court from finding that the employer acted in good faith when it decides the liquidated damages question."  *Alvarez Perez*, 515 F.3d at 1166.

Colvard and BBWB have not met their burden to avoid liquidated damages.  The jury found Defendants willfully violated the FLSA.  That finding is not clearly erroneous.

Keefe testified that she complained to Colvard about unpaid overtime and feared she would be fired each time she brought it up.  She also testified that Colvard told her not to report her hours.  And Forbes testified that Colvard had a practice of not paying overtime.  Plus, Colvard testified that she never consulted with an attorney to ensure her compliance with the FLSA.

To be sure, Colvard and her supporting witnesses offered testimony that disputed Keefe and Forbes's claims.  But the jury reasonably could have found them less credible than Keefe and Forbes.  And given the jury's finding of willfulness, the district court did not abuse its discretion by entering judgment with a doubled award to account for the FLSA's liquidated damages.  *See Alvarez Perez*, 515 F.3d at 1166.

### C. The district court did not err by allowing Keefe to present BBWB's time and payroll records as evidence at trial.

Colvard and BBWB also argue that they are entitled to judgment as a matter of law or a new trial because the district court shouldn't have allowed Keefe to present evidence of the damages she suffered or the hours she worked in any given week. They base their argument on her alleged failure to disclose her damages or respond to discovery requests for this information, in violation of Federal Rule of Civil Procedure 26. So at trial, under Rule 37, Defendants assert, the district court shouldn't have allowed Keefe to present BBWB's time records.

As an initial matter, the record does not show Keefe violated Rule 26 with respect to her damages calculations. Under Rule 26(a)(1)(A)(iii), a party must include in their initial disclosures "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." But as the Notes of the Advisory Committee for the 1993 Amendment to Rule 26 make clear, "a party would not be expected to provide a calculation of damages which . . . depends on information in the possession of another party or person." And that's the case here, where Keefe based the

damages she sought on the ADP payroll records in the defense's possession.

We also don't think Defendants were prejudiced when Keefe responded to their interrogatory by explaining that her unpaid overtime wages were the difference between an average of 34 hours of overtime each week and what she was paid. They could easily discern that figure by summing the total of the hourly overtime rates found in the records she cited, multiplied by 34 hours each week.

Still, Keefe did fail to disclose any material in her possession that showed she worked any specific number of hours in any week. Under Rule 37(c)(1), "[i]f a party fails to provide information" required in discovery, "the party is not allowed to use that information . . . to supply evidence . . . at a trial . . . ." So had the evidence Defendants objected to been originally in Keefe's possession, Rule 37 would bar its use. But Colvard and BBWB objected to the use of their own records, *produced by the defense in discovery*, at trial. Keefe had no obligation to produce the defense's own records, which were not originally in her possession. So Rule 37 does not bar their use at trial, and the district court did not err by admitting them into evidence. We expect the parties to be familiar with their own records.

In sum, Defendants were in no way prejudiced by having to respond at trial to their own produced materials, and the district court did not err by denying their motions for judgment as a matter of law or for a new trial on that basis.

### D. Keefe properly used her illustrative aid during her closing statement.

Next, Defendants contend that the district court committed reversible error by allowing Keefe to use her "demonstrative aid" in her closing statement. They argue that the chart was not based on any admitted evidence. And they suggest that this alleged error entitles them to either judgment as a matter of law or a new trial.

It's not clear why Colvard and BBWB think such an error could lead to judgment as a matter of law because even were we to agree with them (we don't, for the reasons we explain below), the evidence Keefe submitted continues to support the jury's verdict. So we focus on Defendants' claim to a new trial.

A new trial is warranted here only if the use of the aid caused "substantial prejudice" to the Defendants. *See Sanchez v. Discount Rock & Sand, Inc.*, 84 F.4th 1283, 1298 n.7 (11th Cir. 2023). But we see no error in allowing Keefe to use her chart.

Federal courts have long allowed the use of illustrative aids in the presentation of a case to help the jury understand the evidence before it. *See, e.g., id.* at 1298–99; FED. R. EVID. 107 advisory committee's note to 2024 amendments. These types of aids include "charts" that are "offered for the narrow purpose of helping the trier of fact to understand what is being communicated to them by the . . . party presenting . . . argument." FED. R. EVID. 107 advisory committee's note to 2024 amendments.

Effective December 2024, Congress enacted Federal Rule of Evidence 107 to govern the use of these aids. It provides that "[t]he court may allow a party to present an illustrative aid to help the trier of fact understand the evidence or argument if the aid's utility in assisting comprehension is not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time." *See* FED. R. EVID. 107(a). But the trial here occurred before the effective date of the rule. Instead, at time of trial, "the broad standards of Rule 611(a)" governed the use of these aids. *See id.* advisory committee's note to 2024 amendments. That rule provides that a "court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." FED. R. EVID. 611(a).

Applying either standard, we conclude the district court didn't abuse its discretion in allowing Keefe's chart during closing statements. Keefe's chart simply illustrates the math to calculate her unpaid wages based on the evidence she presented. Specifically, it shows how to find the amount owed for 74 hours of work each week from the data in the ADP payroll and Venmo records. As the trial transcript describes the document, the chart does not appear to have in any way introduced new evidence itself.[9] So the

---

[9] Of course, as the complaining party, Defendants bore the duty of proffering the chart for our review. Since they didn't, we conduct our review based on

district court correctly remarked that Keefe's counsel could have just written down all the same information on a whiteboard. Typing it up doesn't make it unfairly prejudicial.

Accordingly, we hold the district court committed no error in allowing the use of Keefe's illustrative aid.

### E. The district court didn't err in denying Colvard and BBWB's motion for a continuance.

Defendants also argue they are entitled to a new trial because the court denied them a two-week continuance. They contend that the late filing of Keefe's trial exhibits and witness list a couple days before trial prejudiced them.

"We have clearly stated that we will not reverse a district court's ruling on a motion for continuance unless the ruling is arbitrary, unreasonable, and severely prejudicial." *SEC v. Levin*, 849 F.3d 995, 1005 (11th Cir. 2017). We consider four factors when determining whether a trial continuance was warranted: (1) "the diligence of the party requesting the continuance to ready the case prior to the date set for trial"; (2) "the likelihood that the need for a continuance could have been met if a continuance was granted"; (3) "the extent to which granting the continuance would have been an inconvenience to the court and the opposing party"; and (4) "the extent to which the requesting party might have suffered harm as a result of the district court's denial of the continuance." *Id.* These

---

the trial transcript's description of the aid and on the chart Keefe provided in her brief.

factors counsel against the requested continuance here. So we can't say that the district court acted arbitrarily, unreasonably, or even prejudicially towards the defense.

Colvard and BBWB were not diligent before the date set for trial. As the district court found, they contributed substantially to the late filing of the trial exhibits and witness list. That's so because they didn't contact Keefe about the filing of a joint pretrial stipulation until three days before it was due. Both parties' trial exhibits were to be attached to that joint pretrial stipulation.

True, if Defendants received a continuance, they would have had more time to familiarize themselves with Keefe's trial exhibits and witness list. But we can't say that Colvard and BBWB were substantially prejudiced by the denial of a continuance. All the documents listed in the trial exhibits were in whole or in part disclosed during discovery. And Defendants themselves produced many of them. The defense should have been familiar with all this material before Keefe filed her exhibit list. As for the witness list, Keefe called only Forbes, Silcox, Colvard, and herself. Silcox was on the defense's witness list. And Colvard and Keefe are the parties. As for Forbes, he was represented by Keefe's counsel and was actively suing Colvard for unpaid overtime at the time of trial, so the defense should have been familiar with him as well.

Plus, Keefe used only four of the 132 exhibits she listed. As the district court recognized, it's ordinary trial practice for parties to list more exhibits than they end up using. It's also common to decide on the fly during trial which exhibits to introduce as

evidence.  Colvard and BBWB themselves listed 33 exhibits that they expected to offer but admitted only 11 into evidence.

And particularly in the Southern District of Florida, with its busy trial docket, a two-week delay imposes a substantial burden on the court and on other litigants as well.

In sum, we find no reversible error in the district court's decision to deny Defendants a continuance.

### F.  The district court didn't err by denying Colvard and BBWB's motion for remittitur.

Having found that Colvard and BBWB are not entitled to judgment as a matter of law or a new trial, we turn to their motion for remittitur.  Colvard and BBWB argue that they are entitled to remittitur because the evidence supports only $14,675.14 in damages.  That figure is Keefe's estimated damages from her initial statement of claim, excluding liquidated damages.

But Keefe provided this estimation of her damages before Defendants produced their payroll records.  She based it on regular hourly rates of $11.89 and $12.16.  But the ADP payroll records showed she had variable hourly rates that ranged from $15.50 to $22.50.  Based on this evidence, we cannot say the district court committed clear error in finding sufficient evidence supported $52,000 in unpaid wages.  And because we've already explained that liquidated damages were warranted, the evidence supports the award of $104,000 in damages.

Accordingly, we affirm the denial of Colvard and BBWB's motion for remittitur.

### G. *The district court didn't abuse its discretion by awarding Keefe costs.*

Having found no reversible error in the judgment below, we turn to the post-judgment award of costs and attorney's fees. Because we affirm the judgment, Keefe remains the prevailing party. And we conclude the district court didn't abuse its discretion in its award of costs and attorney's fees.

We begin with the costs. Federal Rule of Civil Procedure 54(d)(1) states that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party." This "creates a presumption in favor of awarding costs to the prevailing party which [the opposing party] must overcome." *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 639 (11th Cir. 1991). And a court "must have and state a sound basis" for denying costs because "denial of costs is in the nature of a penalty for some defection on the prevailing party's part in the course of the litigation." *Chapman v. AI Transp.*, 229 F.3d 1012, 1039 (11th Cir. 2000) (alteration, citations, and quotation marks omitted). The award of costs is especially important in FLSA cases because the FLSA expressly directs that the court shall award "costs of the action." 29 U.S.C. § 216(b).

Plus, federal law makes copying costs taxable "where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). We have explained that when "evaluating copying costs,

the court should consider whether the prevailing party could have reasonably believed that it was necessary to copy the papers at issue." *U.S. EEOC v. W&O, Inc.*, 213 F.3d 600, 623 (11th Cir. 2000).

Defendants accuse Keefe of having "made up in their entirety" her copying costs. They argue the district court erred by awarding copying costs for one hard copy of all documents produced during discovery, asserting "there was no evidence establishing that *any* copies were actually made." They also contend the district court erred by taxing costs for the printing of three trial notebooks, once more stressing that Keefe introduced only 4 of 132 exhibits at trial. At best, they assert, the printing of only one trial notebook was taxable and not in addition to copying costs for discovery materials. And they argue the district court erred by allowing Keefe to substantiate her copying costs with a chart summarizing them.

We disagree. Rather than commit a clear error in judgment, the district court engaged in a thorough review of Keefe's submitted costs. It was reasonable for the court to find the costs substantiated by the use of a summarizing chart, a method approved in other cases in the Southern District of Florida. *E.g.*, *Aguilera v. JM Cell LLC*, No. 21-62398-CIV, 2022 WL 19228648, at *3 (S.D. Fla. May 18, 2022) (rejecting the defendants' argument that the in-house copying costs needed further substantiation); *Walker v. Grampa's Real Est. Inc.*, No. 0:20-CV-61557, 2022 WL 1157423, at *1–2 (S.D. Fla. Apr. 2, 2022), *report and recommendation adopted*, 2022 WL 1154764 (S.D. Fla. Apr. 19, 2022). And it was especially reasonable because

Keefe's counsel submitted the chart under penalty of perjury, effectively giving it the same evidentiary weight as a sworn statement. *See* 28 U.S.C. § 1746 (signed, dated, and unsworn declarations made under penalty of perjury have the same force and effect as sworn statements).

We also conclude the district court committed no clear error in finding it reasonably necessary for Keefe's counsel to have reviewed one copy of each discovery document in hard copy. And we find it reasonable for Keefe to have printed three trial notebooks—one for the court, one for her counsel, and one for the witnesses. We likewise determine the district court did not clearly err in finding that it was reasonable for Keefe to have listed 132 trial exhibits.

At bottom, Defendants have presented no evidence that these costs were fabricated and have showed no clear error in judgment. We see no abuse of discretion. So we affirm the award of costs.

### H. The district court didn't err by awarding attorney's fees.

We turn now to the award of attorney's fees. The FLSA specifically provides that a plaintiff is entitled to recover reasonable attorney's fees. *See* 29 U.S.C. § 216(b) ("The court in [an action under the FLSA] shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant . . . ."). A reasonable attorney's fee is determined by multiplying a reasonable hourly rate by hours reasonably expended,

potentially adjusted for the result obtained. *See Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299–1302 (11th Cir. 1988). A court "may consider its own knowledge and experience concerning reasonable and proper fees." *Id.* at 1303 (citation omitted).

The court properly conducted that analysis here. Considering its own knowledge of Keefe's counsel's qualifications, experience, skill level, and reputation, it found $375 per hour to be a reasonable hourly rate. And it carefully scrutinized the hours claimed, reducing 299.5 hours claimed to 208.9 hours. We see no clear error in judgment in the award of attorney's fees.

Colvard and BBWB argue that the district court erred by granting any attorney's fees because they claim Keefe's counsel inflated her attorney's fees in bad faith, never made any good-faith effort to resolve the case, and unreasonably billed for reviewing discovery materials and trial exhibits multiple times.

Judges in the Southern District of Florida have found Plaintiff's counsel in the past to have inflated his fees. *See Little v. Garden of New Beginnings Inc.*, No. 19-80207-CV, 2019 WL 13237031, at *2 (S.D. Fla. Aug. 30, 2019) (describing the "history of excessive and unnecessary attorney's fees" billed by Keefe's counsel). But the district court was well aware of Keefe's counsel's history. And it carefully scrutinized his reported hours, finding the bulk to be legitimately and reasonably expended. It also reasonably found that this case could not have been settled prior to trial. So we can't say it abused its discretion in awarding attorney's fees.

## IV.    CONCLUSION

In sum, for the above reasons, we affirm the district court's judgment and the post-judgment award of costs and attorney's fees.

**AFFIRMED.**